**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ALLIANCE OF THE SOUTHEAST and FRIENDS OF THE PARKS, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 23-1524 |
| UNITED STATES ARMY CORPS OF ENGINEERS, | ) ) ) | |
| LIEUTENANT GENERAL SCOTT A. SPELLMON, Chief of Engineers and Commanding General, U.S. Army Corps of Engineers, | ) ) ) ) ) | |
| BRIGADIER GENERAL KIMBERLY PEEPLES, Commander and Division Engineer, Great Lakes and Ohio River Division, U.S. Army Corps of Engineers, and | ) ) ) ) ) ) | |
| COLONEL PAUL CULBERSON, Commander and District Engineer, Chicago District, U.S. Army Corps of Engineers, | ) ) ) ) | |
| Defendants. | ) ) | |

**COMPLAINT**

Plaintiffs Alliance of the Southeast and Friends of the Parks, through their undersigned

counsel, file this Complaint and allege as follows:

**INTRODUCTION**

1. This is a civil action for declaratory and injunctive relief under the judicial review

provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, challenging the

decision of the U.S. Army Corps of Engineers and its named officials ("Corps") approving

1

construction of the Calumet Harbor Dredged Material Disposal Facility ("DMDF") in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, Section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344, and the requirements set forth in 33 U.S.C. § 2326a(c), and corresponding administrative rules. This action also challenges the Corps' plans to construct the Calumet Harbor DMDF on public trust land in violation of Illinois Public Act 82-770, and the public trust doctrine under Illinois law.

2. The proposed Calumet Harbor DMDF would be built on top of the existing 45-acre Confined Disposal Facility ("CDF") in southeast Chicago along the Lake Michigan lakefront just north of Calumet Park, which the Corps has used for nearly 40 years to dispose of material dredged from the Chicago Area Waterway System ("CAWS"). The DMDF will enable the Corps to continue disposing dredged materials on top of the CDF site for at least another 20 years.

3. The CDF is located on submerged Lake Michigan lakebed, which the State of Illinois holds in the public trust. In 1982, the State deeded the tract to the Chicago Park District "for the improvement of certain harbor and park facilities." Illinois Public Act 82-770 (June 29, 1982). The Act allowed construction and use of "a contained spoil disposal facility as contemplated by Section 123 of Public Law 91-611," a federal statute that authorized the operation of such facilities for not more than ten years. *Id.* At that point, the Chicago Park District would then take possession of the reclaimed land and convert it into a new public park adjoining Calumet Park, thereby providing recreational opportunities for local community residents and all Chicagoans.

4.      In 1982, the Chicago Park District executed a partnership agreement ("1982 Intergovernmental Agreement") with the Corps according to the terms set forth in the state statute.

5.      The Corps constructed the CDF and began disposal operations in 1984.

6.      Instead of ceasing operations after ten years, however, the Corps has continued to dispose of contaminated dredge material in the CDF for almost forty years.

7.      The CDF is at full capacity, but the Corps has decided to construct a DMDF on top of the CDF and continue disposal for another twenty years or more.

8.      When completed, the DMDF and its contaminated dredged materials will rise approximately 25 feet above ground level of the adjoining parkland.

9.      The proposed DMDF would also have a larger horizontal footprint than the existing CDF by approximately 4.32 acres.

10.      On information and belief, despite the restrictions in the original authorizing legislation, the Chicago Park District is a non-federal sponsor of the DMDF construction project.

11.      On information and belief, the Chicago Park District stands ready to furnish the Corps with the necessary land use rights to construct and operate the DMDF.

12.      The State of Illinois has not authorized the construction of a DMDF or any new expanded disposal facility on the property.

13.      On information and belief, neither the Corps nor the Chicago Park District have sought legislative approval to construct and operate a DMDF on the site.

14.      On information and belief, the Corps appears to be proceeding on the assumption that the Chicago Park District does not need legislative approval to permit the construction and operation of the DMDF.

15.     The Corps' arrangement with the Chicago Park District violates both federal and state law. The Corps' decision to construct and operate the DMDF without the Illinois legislature's approval violates the requirements of its specific federal authorizing legislation, 33 U.S.C. § 2326a(c), and the 1982 Intergovernmental Agreement between the Corps and the Chicago Park District.

16.     The Corps cannot satisfy its obligations under 33 U.S.C. § 2326a(c), and the 1982 Intergovernmental Agreement by way of an agreement between the Corps and the Chicago Park District when the Chicago Park District lacks the authority to grant land use rights for the construction and operation of the DMDF.

17.     Any purported grant of land use rights by the Chicago Park District to the Corps for purposes of the DMDF is *ultra vires* use of public trust property by a state agency in violation of the terms of Illinois Public Act 82-770 and the Illinois Public Trust Doctrine.

18.     The "Integrated Environmental Impact Statement" prepared by the Corps does not adequately consider less environmentally damaging alternatives to the DMDF project as required by federal law.

19.     The Corps' "Integrated Environmental Impact Statement" does not adequately consider cumulative adverse environmental effects on the southeast Chicago environmental justice community as required by NEPA and its applicable regulations.

20.     The Corps' "Integrated Environmental Impact Statement" does not adequately or accurately assess the social, economic, or environmental costs of the proposed DMDF facility as required by NEPA and its applicable regulations.

21.     The only alternatives considered by the Corps were the CDF site and four other sites in southeast Chicago's Tenth Ward. *See* Figure 1.

4

Figure 1: Location of the CDF and Four Alternatives
(from DMMP/EIS, at pg. 13)



22.     The construction and operation of the DMDF also fails to satisfy the regulatory requirement that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a); *see also* 33 C.F.R. Parts 335, 336, 337, 338.

23.     The construction of this DMDF is not the "least costly alternative[ ] consistent with sound engineering practices and meeting the environmental standards established by the 404(b)(1) evaluation process." 33 C.F.R. § 335.7. The Corps' assessment and measurement of costs is, at best, incomplete and ignores significant societal, economic, and environmental costs.

24.     The construction and operation of the DMDF is also "contrary to the public interest" under 33 C.F.R. § 320.4.

25.     In particular, the DMDF is not consistent with the "Principles and Requirements for Federal Investments in Water Resources," dated March 2013, and it is not consistent with the Assistant Secretary of the Army's Environmental Justice Guidance to the Army Corps of Engineers, dated March 15, 2022.

26.     For these reasons, the Corps' Record of Decision approving the EIS and documenting its decision to build the DMDF is arbitrary and capricious and not in accordance with law, and therefore must be set aside under the APA, 5 U.S.C. § 706. In addition, because the Chicago Park District's decision to permit the construction and operation of the DMDF is *ultra vires* under Illinois law, the Corps lacks legal authority to proceed with the DMDF and its Record of Decision approving the EIS is not in accordance with law, and therefore must be set aside under the APA, 5 U.S.C. § 706.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction of the claims brought in this action against the Corps pursuant to 28 U.S.C. §§ 1331 and 1346.

28.     Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b)(1), (b)(2), and (e)(1), because the Corps has an office in and resides in this district, a substantial part of the

events or omissions giving rise to the claims occurred in this district, and the property that is the subject of this action is located in this district.

## PARTIES

29.     Plaintiff Alliance of the Southeast ("ASE") is an Illinois not-for-profit corporation. ASE is a multicultural, interfaith, and intergenerational alliance consisting of individuals and community organizations that engage grassroots participation to address the challenges facing southeast Chicago neighborhoods, including those surrounding the CDF and proposed DMDF site. ASE works on a number of issues, including issues involving environmental and public health threats to people and communities in southeast Chicago, and ASE works to improve the quality of life and recreational enjoyment for community residents. *See* Exhibit 1 (Declaration of Amalia NietoGomez). The interests at stake in this action are germane to ASE's purpose. ASE asserts organizational standing to bring this action on its own behalf.

30.     ASE has members who live, work, go to school, and recreate in the vicinity of the CDF and proposed DMDF site, including the adjoining Calumet Park. These members include long-time residents of southeast Chicago who live near the CDF and Calumet Park and who: (a) have been deprived of the use of a larger Calumet Park, including access to the lakefront and Calumet Harbor land where the CDF operates; (b) have been exposed to the contaminated water draining from the CDF while recreating on the lakeshore of Calumet Park; and (c) continue to have these and other injuries. One or more members of ASE have suffered an "injury in fact" that is "fairly traceable" to the CDF and proposed DMDF. These members include, but are not limited to: Arnold Bradford, Marie Collins-Wright, Daniel Villalobos-Terrazas, and Kathryn

Vincent. Attached as Exhibit 2 are the Declarations from each of these members. ASE asserts standing to bring this action on behalf of its members.

31.     Plaintiff Friends of the Parks ("FOTP") is an Illinois not-for-profit corporation. Founded in 1975, FOTP serves to inspire, equip, and mobilize a diverse Chicago to ensure a vibrant and equitable park system for a healthy Chicago, including the parks in southeast Chicago. *See* Exhibit 3 (Declaration of Juanita Irizarry). The interests at stake in this action are germane to FOTP's purpose. FOTP asserts organizational standing to bring this action on its own behalf.

32.     FOTP has members who live, work, and have businesses in the vicinity of the CDF and proposed DMDF site, and who regularly recreate in Calumet Park and elsewhere nearby. These members include residents and property owners in the neighborhoods adjoining the CDF, who regularly birdwatch in Calumet Park and in Steelworkers Park across the Calumet Harbor from the CDF, and who regularly swim at Calumet Beach and run along the shoreline of Calumet Park. These members: (a) have been deprived of the use of a larger Calumet Park, including access to the lakefront and Calumet Harbor land where the CDF operates; (b) have been exposed to the contaminated water draining from the CDF while recreating on the lakeshore of Calumet Park; and (c) continue to have these and other injuries. One or more members of FOTP have suffered an "injury in fact" that is "fairly traceable" to the DMDF. These members include, but are not limited to: Ders Anderson, Joseph B. Daniel, Walter Marcisz, Amy Lynn Lindner, Joann Marie Podkul, and Steven Walsh. Attached as Exhibit 4 are the Declarations from each of these members. FOTP asserts standing to bring this action on behalf of its members.

33. Defendant United States Army Corps of Engineers is a branch of the United States Army in the Department of Defense responsible for the management of dredged material under 33 U.S.C. § 2326 *et seq.*, Section 123 of the Rivers and Harbors Act, 33 U.S.C. § 1293a, and implementing regulations.

34. Defendant Lieutenant General Scott A. Spellmon is the Chief of Engineers and Commanding General of the Corps and is sued in his official capacity.

35. Defendant Brigadier General Kimberly Peeples is the Commander of the Great Lakes and Ohio River Division of the Corps and is sued in her official capacity.

36. Defendant Colonel Paul Culberson is Commander of the Chicago District of the Corps and is sued in his official capacity.

## STATUTORY AND REGULATORY BACKGROUND

**I.** **Relevant Authority of the U.S. Army Corps of Engineers**

37. The Corps constructed the CDF under Section 123 of the Rivers and Harbors Act of 1970, Pub. L. No. 91-611, 84 Stat. 1818, 1823-24 (1970), codified at 33 U.S.C. § 1293a.

38. The Rivers and Harbors Act states that the Corps may "construct, operate, and maintain, ***subject to the provisions of subsection (c)***, contained spoil disposal facilities of sufficient capacity for a period ***not to exceed ten years***." 33 U.S.C. § 1293a(a) (emphasis added).

39. Subsection (c) requires prior written agreement by the State or other appropriate political subdivision of the State with legal authority to, among other things "furnish all lands, easements, and rights-of-way necessary for the construction, operation, and maintenance of the facility." 33 U.S.C. § 1293a(c).

40.     In 1988, Congress amended Section 123 of the Rivers and Harbors Act to allow the Corps to continue depositing dredged materials into a CDF until the facility is "no longer needed for such purpose or that such facility is completely full." 33 U.S.C. § 1293a(j).

41.     The 1988 amendment did not alter the Corps' obligation, under 33 U.S.C. § 1293a(c), to secure land use rights from the appropriate State authority by prior written agreement.

42.     In 2007, Congress authorized the Corps to acquire, design, construct, manage, or operate a new kind of facility known as a DMDF. 33 U.S.C. § 2326a(c)(1).

43.     Similar to a CDF, the Corps constructs a DMDF only after "each non-Federal interest has entered into a written partnership agreement with the Secretary . . . under which each party agrees to carry out its responsibilities and requirements for implementation or construction of the project or the appropriate element of the project." 42 U.S.C. § 1962d-5b(a)(1).

44.     These "responsibilities and requirements" include "providing all necessary lands, easements, relocations, and rights-of-way associated with the facility." 33 U.S.C. § 2326a(c)(5)(C)(i).

## II.     <u>Relevant Illinois State Law</u>

45.     Title to submerged land is vested in the state in which the land is found. *Illinois Cent. R. Co. v. State of Illinois*, 146 U.S. 387, 435 (1892). The land is held in the public trust, and under the public trust doctrine the State has a "right to use or dispose of any portion thereof" only "when that can be done without substantial impairment of the interest of the public in the waters." *Id.*

46.     Although the public trust doctrine is usually understood as a prohibition on the sale of trust land to private persons, *see id.*, Illinois law recognizes two additional limitations.

10

First, when the legislature confers in an agency a proprietary interest in public trust lands, the agency may not freely allocate the land to any use it desires, including any public use. "[D]iversions in the use of public trust lands" are *ultra vires* unless "there has been a sufficient manifestation of legislative intent to permit the diversion and reallocation contemplated by" the agency. *Paepcke v. Pub. Bldg. Comm'n of Chicago*, 46 Ill. 2d 330, 342, 263 N.E.2d 11, 19 (Ill. 1970). Second, the public trust doctrine remains vital when state agencies "serve as local sponsor" for a federal navigational project. *Parsons v. Walker*, 28 Ill. App. 3d 517, 518, 328 N.E.2d 920, 922 (Ill. App. Ct. 1975).

### III. The National Environmental Policy Act

47.     NEPA "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a) (2019).

48.     In furtherance of NEPA's goal, federal agencies are required to fully and fairly evaluate in advance the environmental impacts of all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.4 (2019). This evaluation is conducted in an Environmental Impact Statement ("EIS") as required by NEPA and regulations adopted by the Council on Environmental Quality ("CEQ").[1]

49.     An EIS that meets the requirements of NEPA and the CEQ rules must *precede* any final "major" federal agency action, or else the federal agency action is invalid.

50.     CEQ regulations require that all federal agency EISs: (a) describe the general problem that needs to be solved in a Purpose and Need Statement; (b) describe and evaluate all reasonable alternatives for addressing the general problem, including a "no action" alternative;

---

[1]     This Complaint cites to the 2019 version of CEQ's NEPA regulations, 40 C.F.R. § 1500 *et seq.*, which were in place when the Corps approved the Record of Decision at issue in June 2020. CEQ adopted new NEPA regulations in 2022.

and (c) take a hard look at the direct, indirect, and cumulative economic, social, and environmental impacts of each of those alternatives, considering possible mitigation options. 40 C.F.R. §§ 1502.13, 1502.14, 1502.16 (2019).

51.     The Purpose and Need Statement must describe the *general problem* that needs to be solved, in a solution-neutral manner that does not predetermine the outcome of the NEPA process. The Purpose and Need Statement is a key step because it defines the universe of reasonable alternatives that the agency must then evaluate. *Simmons v. U.S. Army Corps of Engineers*, 120 F.3d 664, 666 (7th Cir. 1997).

52.     The purpose and need statement cannot be skewed in a manner that predetermines the agency's outcome. As the Seventh Circuit explained in *Simmons*, "One obvious way for an agency to slip past the strictures of NEPA is to contrive a purpose so slender as to define competing 'reasonable alternatives' out of consideration (and even out of existence). The federal courts cannot condone an agency's frustration of Congressional will. If the agency constricts the definition of the project's purpose and thereby excludes what truly are reasonable alternatives, the EIS cannot fulfill its role. Nor can the agency satisfy the Act. 42 U.S.C. § 4332(2)(E)." *Simmons*, 120 F.3d at 666.

53.     NEPA and the CEQ rules further require agencies to "[r]igorously explore and objectively evaluate all reasonable alternatives" to meet the purpose and need, including a "no action" alternative. 40 C.F.R. § 1502.14 (2019).

54.      CEQ's regulations describe the selection and evaluation of alternatives as "the heart of the environmental impact statement." *Id.*

55.     "When a federal agency prepares an Environmental Impact Statement (EIS), it must consider 'all reasonable alternatives' in depth. No decision is more important than

12

delimiting what these 'reasonable alternatives' are. That choice, and the ensuing analysis, forms 'the heart of the environmental impact statement'." *Simmons*, 120 F.3d at 666 (citing 40 C.F.R. § 1502.14).

56.     An EIS must also include a discussion of connected and cumulative actions and must assess direct, indirect, and cumulative impacts. 40 C.F.R. § 1508.25 (2019).

57.     A "cumulative impact" is defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7 (2019).

58.     Effects or impacts includes "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health [effects], whether direct, indirect, or cumulative." 40 C.F.R. § 1508.8 (2019).

III.    **The Corps' Public Interest Obligations**

59.     The Corps' regulations provide that projects may not be approved if they "would be contrary to the public interest." 33 C.F.R. § 320.4(a)(1).

60.     "All factors which may be relevant to the proposal must be considered including the cumulative effects thereof." *Id.* Among the factors to be considered are "conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food

and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people." *Id.*

61.     The Corps' "public interest" review must, "in the evaluation of every application" consider: "(i) The relative extent of the public and private need for the proposed structure or work; (ii) Where there are unresolved conflicts as to resource use, the practicability of reasonable alternative locations and methods to accomplish the objective of the proposed structure or work; and (iii) The extent and permanence of the beneficial and/or detrimental effects which the proposed structure or work is likely to have on the public and private uses to which the area is suited." *Id.* § 320.4(a)(2).

62.     The Corps' public interest review is also subject to the Principles and Requirements for Federal Investments in Water Resources, dated March 2013, established pursuant to the Water Resources Planning Act of 1965, Pub. L. 89-8, as amended, *codified at* 42 U.S.C. § 1962a-2 ("2013 Principles").

63.     The 2013 Principles require federal agencies like the Corps to "ensure that Federal actions identify any disproportionately high and adverse public safety, human health, or environmental burdens of projects on minority, Tribal, and low-income populations" and "seek solutions that would eliminate or avoid disproportionate adverse effects on these communities." 2013 Principles, ¶ 3.E.

64.     On March 15, 2022, the Assistant Secretary of the Army for Civil Works issued a memorandum providing interim guidance relating to the implementation of environmental justice and the administration's Justice40 Initiative to the Corps' civil works programs ("2022 Interim Guidance"),

https://www.army.mil/article/254935/assistant_secretary_of_the_army_for_civil_works_issues_environmental_justice_guidance_to_the_army_corps_of_engineers.

65.     The 2022 Interim Guidance requires the Corps to "work to meet the needs of disadvantaged communities by reducing disparate environmental burdens, removing barriers to participation in decision-making, and increasing access to benefits provided by [the Corps'] Civil Works programs to disadvantaged communities." *Id.* ¶ 3.

66.     The 2022 Interim Guidance further directs that "[i]f adverse effects of Civil Works programs and services are identified, [the Corps] will take steps to avoid, minimize, or mitigate those impacts to the greatest extent reasonable." *Id.*

67.     The 2022 Interim Guidance also directs the Corps to meet the goals of the whole-of-government Justice40 initiative by assuring that "40% of [the Corps'] investments in climate and critical clean water and waste infrastructure must benefit disadvantaged communities." *Id.* ¶ 6.

## IV.     Clean Water Act Section 404(b)(1)

68.     Under Section 404(b)(1) of the Clean Water Act ("CWA"), 33 U.S.C. § 1344(b)(1), the Corps cannot approve or permit a project "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem." 40 C.F.R. § 230.10(a).

69.     The Section 404(b)(1) Guidelines require the Corps to select the Least Environmentally Damaging Practicable Alternative ("LEDPA"). *See generally* August 23, 1993 EPA/Corps Memorandum to the Field concerning the Appropriate Level of Analysis Required for Evaluating Compliance with the Section 404(b)(1) Guideline Alternatives Requirements,

https://www.epa.gov/cwa-404/memorandum-appropriate-level-analysis-required-evaluating-compliance-cwa-Section-404b1.

70.     The Section 404(b)(1) Guidelines likewise require the Corps to conduct a rigorous alternatives analysis to satisfy the LEDPA requirement. 40 C.F.R. § 230.10(a).

**V.     The Administrative Procedure Act**

71.     The Administrative Procedure Act ("APA") grants a right of judicial review to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . ." 5 U.S.C. § 702.

72.     Under the APA, a court must "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." *Id.* § 706(2)(A). An agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Assoc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

73.     Under the APA, a court must also "hold unlawful and set aside" any agency action taken that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(c).

**FACTUAL BACKGROUND**

74.     The neighborhoods surrounding the CDF and the proposed location of the DMDF in Southeast Chicago are vulnerable, environmentally overburdened, underserved, and/or economically distressed communities that have suffered disproportionately adverse human health

16

and environmental impacts as the result of active and legacy pollution from numerous industrial and other sources.

75.    The Corps is required to consider environmental justice and disproportionate impacts to disadvantaged communities throughout its civil works programs and in all phases of project planning and decision-making.

### *The Confined Disposal Facility*

76.    The Chicago Area Waterway System ("CAWS") consists of more than 100 miles of rivers and canals connecting Lake Michigan with the Mississippi River via the Lower Des Plaines and Illinois Rivers. The CAWS includes the natural branches of the Chicago and Calumet Rivers, and the artificial Chicago Sanitary and Ship Canal and the Cal-Sag Channel that were built more than 100 years ago.

77.    The Corps occasionally dredges channels in the CAWS.

78.    Some of the dredged sediments contain arsenic, barium, cadmium, chromium, copper, lead, manganese, mercury, nickel, zinc, polychlorinated biphenyls ("PCBs"), or other pollutants.

79.    In the early 1980s, the Corps proposed constructing a Confined Disposal Facility ("CDF") by the Lake Michigan shoreline to dispose of dredged material from the CAWS.

80.    The Corps relied on Section 123 of the Rivers and Harbors Act, 33 U.S.C. § 1293a, as its authority to construct the CDF.

81.    For the site of the CDF, the Corps proposed land submerged beneath the waters of Lake Michigan. Public Act 82-770, § 1-2.

82.    As submerged land, the CDF's location was public trust land under the trust responsibility of the State of Illinois.

83.     In 1982, the Illinois General Assembly passed a bill quitclaiming and conveying its right, title, and interest in the proposed CDF lakebed site to the Chicago Park District. Pub. Act 82-770 (June 29, 1982). The stated purpose was "the improvement of certain harbor and park facilities, in order to further the public interest and benefit navigation, including the construction, use, and maintenance upon such land of a confined disposal facility, as contemplated by Section 123 of Public Law 91-611." *Id.* art. 1, § 1-2.

84.     The limitation on the Chicago Park District's authority to permit uses incorporates by reference "Section 123 of Public Law 91-611," the federal provision that permits the Corps to construct, use and maintain a CDF. In 1982, Section 123 only permitted the Corps to construct, operate, and maintain the CDF "for a period not to exceed ten years." 33 U.S.C. § 1293a(a).

85.     The State of Illinois intentionally incorporated the ten-year use limitation found in Section 123 of Public Law 91-611.

86.     The reversion of the site to the Chicago Park District once the CDF was full was essential to the Illinois legislature's statutory scheme.

87.     When the Illinois General Assembly passed this legislation, they were told that:

> [O]ver a ten year period . . . the dredging would take ten years, they would fill in this facility with the dredgings from the River which, ultimately, would result in 40 acres of additional . . . Chicago Park District land for Calumet Park. So . . . in ten years we would have our River dredged, and we would have 40 acres of new park land.

82nd Ill. Gen. Assembly, House Proceedings, May 3, 1982, at 56 (statement of Rep. Collins) (available at https://perma.cc/66SP-UV8C).

88.     On July 31, 1982, the Corps, the Chicago Park District, and the Chicago Regional Port District (now named the Illinois International Port District) entered into an intergovernmental agreement ("the 1982 Intergovernmental Agreement," attached hereto as

Exhibit 5) whereby the Chicago Park District conveyed a "right to enter" the lakebed site as needed for purposes of the construction, operation, and maintenance of what would become the CDF. Under the 1982 Intergovernmental Agreement, the Chicago Park District retained title to "all lands, easements, and rights-of-way furnished by them" for purposes of the spoil disposal facility.

89.     The 1982 Intergovernmental Agreement expressly acknowledged that Section 123 only authorized a spoil disposal facility "of sufficient capacity to contain the deposits of dredged materials for a period not to exceed 10 years." *Id.*

90.     The Corps started and finished construction of the CDF between 1982 and 1984, entirely at federal expense.

91.     The ten-year limit in Section 123 of the Rivers and Harbors Act, which was incorporated into the Illinois statute authorizing the Chicago Park District to provide the Corps access to the CDF site, expired no later than 1994.

92.     Even if the subsequent 1988 amendment to Section 123 is read into the Illinois statute, the Corps is only permitted to operate a CDF until, in the opinion of the Corps, "such facility is completely full." 33 U.S.C. § 1293a(j).

93.     The Corps did not turn the CDF site over to the Chicago Park District in 1994 or at any time thereafter, but has continued to use the CDF site to dispose of dredged material.

94.     The Corps has acknowledged that the CDF was due to reach full capacity in 2022. *See* Exhibit 6, at 4.

95.     Over the next twenty years, the Corps anticipates that only the Calumet Harbor and River and the Cal-Sag Channel in the CAWS will be dredged.

### *The Dredged Material Disposal Facility*

96.     Instead of returning use of the CDF back to the Chicago Park District, the Corps proposes to extend the capacity of the CDF to accept dredged sediments for an additional 20 years by building a dredged material disposal facility ("DMDF") on top of the CDF.

97.     As its authority to construct the DMDF, the Corps relies on 33 U.S.C. § 2326a(c), which requires that a "non-federal sponsor" provide "all necessary lands, easements, relocations, and rights-of-way" for a new facility.

98.     The Chicago Park District retains title to the site, but as its legislative authority expired no later than 1994, it no longer has the ability to furnish the Corps with the necessary "lands, easements, or rights-of-way" for the DMDF.

99.     Nevertheless, the Corps has proposed that it retains the access rights to the property that the Chicago Park District provided for the CDF in the early 1980s.

100.    The Corps has also proposed that the Chicago Park District, the Illinois International Port District, and the City of Chicago pay 35 percent of the DMDF's construction costs.

101.    The Chicago Park District, the Illinois International Port District, and the City of Chicago have agreed to the arrangement described in the preceding paragraph, as "non-Federal interests" – also known as non-federal sponsors – for the proposed DMDF project. 33 U.S.C. § 2326a(c)(1); *see* Exhibit 6, at 142, 146.

102.    On August 20, 2020, the Corps, the City of Chicago, and the Chicago Department of Transportation released a document entitled the Chicago Area Waterways System ("CAWS") Dredged Material Management Plan ("DMMP") and Integrated Environmental Impact Statement

("DMMP/EIS") "to identify and evaluate alternative plans for dredged material management for the CAWS over a 20 year period of analysis." *See* Exhibit 6, Executive Summary.

103. The DMMP/EIS document identifies vertical expansion of the existing CDF as the "Recommended Plan" for implementation.

104. The DMMP/EIS does not analyze the social or cultural costs of denying the citizens of southeast Chicago and the surrounding region a promised public park resource for another 20 years.

105. The DMMP/EIS does not assess the cumulative impacts of the DMDF in addition to all "past, present, and reasonably foreseeable" pollution sources.

106. The DMMP/EIS for the DMDF project did not evaluate whether it complied with the 2013 Principles when it conducted its "public interest" review.

107. On information and belief, the Corps has not amended the DMMP/EIS to address the goals and requirements of the 2022 Interim Guidance.

108. The DMMP/EIS bases its conclusion that the DMDF will have no significant impact on Lake Michigan water quality solely on inadequate historical water quality monitoring reports, *see* Exhibit 6, at 94, even though the amount of contaminated material on the expanded site would increase substantially.

109. A peer review of the DMMP/EIS conducted by Battelle Memorial Institute on behalf of the Corps concluded that the DMMP/EIS "does not assess risks and impacts from climate change on the future project or from project activities on the climate." See Battelle Memorial Institute, *Final Independent External Peer Review Report of the CAWS DMMP/EIS, Calumet Harbor and River, Illinois and Indiana*, August 22, 2019, at 3. (Attached hereto as Exhibit 7).

110.     The Battelle Memorial Institute's peer review recommended that the DMMP/EIS "[e]xplicitly assess and estimate possible effects on [the DMDF project] from climate change, including the effects of lake levels, waves, and increases in rainfall events and their intensity upon the [facility] or new berm walls, as well as the effects of lower water levels on dredging quantities." *Id.* at 12.

111.     Nevertheless, the DMMP/EIS's discussion of climate change impacts is solely limited to a general description of greenhouse gas pollution in the Chicago area and the conclusion that neither the DMDF nor any of the alternatives would significantly affect Chicago's climate.

112.     On June 26, 2020, the Corps issued a Record of Decision that concluded that the proposed DMDF was consistent with all requirements of the law and should proceed. *See* Exhibit 8.

113.     The Corps' Record of Decision concluded that the DMMP/EIS met all the requirements of NEPA, that the proposed DMDF was the least environmentally damaging practicable alternative under the 404(b)(1) Guidelines, and that the DMDF project was not "contrary to the public interest" under 33 C.F.R. § 320.4(a)(1).

114.     On information and belief, Plaintiffs are not aware that the Corps has commenced construction of the DMDF.

**FIRST CAUSE OF ACTION**
**Violation of 33 U.S.C. § 2326a(c):**
**The Corps' Expansion of the CDF's Footprint**
**and Continued Disposal of Dredged Material**

115.    Plaintiffs incorporate, reallege, and restate each of the allegations contained in paragraphs 1 through 114 above.

116.    The Corps' stated authority for its construction, maintenance, and operation of the DMDF on top of the existing CDF site is 33 U.S.C. § 2326a through 2326c. That authority prohibits the Corps from commencing construction of a DMDF "until each non-Federal interest has entered into a written partnership agreement with the Secretary . . . under which each party agrees to carry out its responsibilities and requirements for implementation or construction of the project or the appropriate element of the project." 42 U.S.C. § 1962d-5b(a)(1), *incorporated by reference in* 33 U.S.C. § 2326a(c)(1). These "responsibilities and requirements" include "providing all necessary lands, easements, relocations, and rights-of-way associated with the facility." 33 U.S.C. § 2326a(c)(5)(C)(i).

117.    The Corps purports to satisfy 33 U.S.C. § 2326a(c)(5)(C)(i) apparently by presuming that the non-federal sponsors of the project, principally the Chicago Park District, will furnish the requisite land use rights, both for the site of the existing CDF owned by the Chicago Park District and the additional 4.32 acres of submerged lakebed owned by the State of Illinois. *See* DMMP/EIS at 146, 149.

118.    The Chicago Park District does not have the authority to grant such rights.

119.    On information and belief, the Chicago Park District has or will imminently purport to provide the Corps with "all necessary lands, easements, relocations, and rights-of-way associated with the [proposed DMDF facility]." 33 U.S.C. § 2326a(c)(5)(C)(i).

120.     The Chicago Park District's furnishing of such rights is *ultra vires* action inconsistent with the scope of its statutory authority to use the public trust land.

121.     When the Illinois legislature initially authorized construction of the CDF, it qualified and limited the transfer of the specified Lake Michigan lakebed to the Chicago Park District by stating that the property can only be used "for the improvement of certain harbor and park facilities, in order to further the public interest and benefit navigation, including the construction, use and maintenance upon such land of a contained spoil disposal facility as contemplated by Section 123 of Public Law 91-611." Illinois Public Act 82-770, art. 1, § 1-1 (June 29, 1982).

122.     By expressly referencing Section 123 of the Rivers and Harbors Act, the Illinois legislature limited its transfer of specific lakebed land to the Chicago Park District to "construct, operate, and maintain . . . contained spoil disposal facilities of sufficient capacity *for a period not to exceed ten years*." 33 U.S.C. § 1293a(a) (emphasis added).

123.     The Illinois legislature further intended that the Chicago Park District would convert the land — when reclaimed — for use as a public park.

124.     The Chicago Park District lacked legal authority to permit continued use of the CDF and delay the creation of a public park after 1994, and it certainly lacks that authority today.

125.     In particular, the Chicago Park District lacks the authority to furnish rights that would enable the construction of a new DMDF, which is not "a contained disposal facility as contemplated by Section 123 of Public Act 91-611." Illinois Pub. Act. 82-770 art. I § 1-1. This extra-statutory action is *ultra vires* under ordinary separation of powers principles, as well as an

24

impermissible "diversion[] in [the] use of public trust lands" under *Paepcke v. Pub. Bldg. Comm'n of Chicago*, 46 Ill. 2d 330, 343, 263 N.E.2d 11, 19 (Ill. 1970).

126. In addition to furnishing rights on the land to which it has title, on information and belief, the Chicago Park District has, or imminently will, purport to convey land use rights to an additional 4.32 acres of public trust lakebed beyond the footprint of the CDF for the purpose of building a new dredge transfer dock on the north face of the existing CDF. To the extent that this land is outside the boundaries of the original quitclaim deed, the State of Illinois continues to hold title to the additional 4.32 acres of land and the Chicago Park District's actions respecting this property are *ultra vires* and violate the public trust doctrine.

127. The Corps' decision to approve the DMDF project and commence, or imminently commence, construction without first securing the necessary land use rights through Illinois legislation passed by the General Assembly and signed by the Governor is contrary to law, 33 U.S.C. § 2326a(c)(5)(C)(i), and must be set aside under 5 U.S.C. § 706.

### SECOND CAUSE OF ACTION
### Violation of the National Environmental Policy Act:
### The Corps' Arbitrary and Capricious Decision-Making Regarding the DMDF

128. Plaintiffs incorporate, reallege, and restate each of the allegations contained in paragraphs 1 through 114 above.

129. The DMMP/EIS approved by the Corps in its June 26, 2020 Record of Decision did not comply with NEPA's requirements, 42 U.S.C. § 4321 *et seq.,* or with the CEQ's environmental review rules.

130. The Corps' Purpose and Need Statement in the DMMP/EIS is improperly limited to "the construction of a new sediment management facility, as well as the feasibility of expanding the existing Chicago Area CDF to provide the required capacity for safely handling

material that is too contaminated for beneficial use." *See* Exhibit 6, at 4. The Corps' DMMP/EIS defined the "purpose and need" too narrowly and, thereby, excluded consideration of reasonable alternatives, in violation of 40 C.F.R. §§ 1502.13, 1502.14 (2019).

131.    Just as the Seventh Circuit concluded in *Simmons,* "the U.S. Army Corps of Engineers defined an impermissibly narrow purpose for the contemplated project. The Corps therefore failed to examine the full range of reasonable alternatives and vitiated the EIS." *Simmons*, 120 F.3d at 667.

132.    The Corps' DMMP/EIS did not "rigorously explore and objectively evaluate all reasonable alternatives" as NEPA requires. 40 C.F.R. § 1502.14(a) (2019). The Corps' consideration was incomplete and premised on false assumptions.

133.     The Corps' DMMP/EIS's comparison of the alternatives in the DMMP/EIS was unduly skewed to favor the CDF expansion alternative.

134.    The Corps' DMMP/EIS only considered five alternatives: (a) expansion on the CDF site (the preferred alternative), and (b) four other locations for a disposal facility further up the Calumet River. *See* Figure 1.

135.    All of the alternatives considered were waterway locations sited only in Chicago's 10th Ward on the Southeast Side.

136.    The Corps failed to take the required hard look and "rigorously explore and objectively evaluate all reasonable alternatives" including (a) other available disposal facilities managed by the Corps in the region with unused capacity; (b) other upland landfill locations; (c) source reduction through land use management and green infrastructure to reduce the need for dredging; and (d) cleaning the dredged material of contaminants sufficiently to open up a broader range of disposal alternatives.

137.    The Corps' comparison of alternatives in the DMMP/EIS attributes zero real estate costs to the CDF site expansion option, but assigns several million dollars in real estate costs to the other alternatives.

138.    The Corps' DMMP/EIS assumes that the Chicago Park District will indefinitely furnish the existing CDF site at no cost.

139.    The Corps' DMMP/EIS assumes no additional cost resulting from higher water levels and more intensive storms driven by climate change and other factors along the Lake Michigan lakeshore.

140.    The Corps' DMMP/EIS also does not consider long-term operation, maintenance, repair, replacement and rehabilitation costs after closure that will have to be borne by the Chicago Park District.

141.    The Corps' DMMP/EIS also assigns no lost opportunity costs to the existing CDF site, including the value of the long-promised new lakefront park for the public.

142.    The Corps' DMMP/EIS did not fully and fairly evaluate the cumulative impacts of the incremental DMDF "action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions" on people, the environment and the Southeast Side of Chicago community and the environmental impacts.

143.    The Corps' DMMP/EIS did not fully and fairly evaluate and take the required hard look at the impacts of climate change with regard to the DMDF project, or on the need for continued dredging.

144.     For all of these reasons, the Corps' DMDF/EIS and its Record of Decision approving it were arbitrary and capricious and contrary to law under 5 U.S.C. § 706, and must be set aside.

**THIRD CAUSE OF ACTION**
**Violation of Section 404(b)(1) of the Clean Water Act:**
**The Corps' Proposed DMDF is Arbitrary and Capricious and Contrary to Law**
**Because it Fails to Consider Less Environmentally Damaging Alternatives**

145.     Plaintiffs incorporate, reallege, and restate each of the allegations contained in paragraphs 1 through 114 above.

146.     The Corps is prohibited from approving civil works projects like the DMDF if there is a less environmentally damaging practicable alternative. 40 C.F.R. § 230.10; 33 U.S.C. § 1344(b)(1).

147.     The alternatives specified in paragraph 136 above, among others, would be practicable and less environmentally damaging than the DMDF as presently proposed by the Corps.

148.     The Corps' DMMP/EIS did not fully and fairly evaluate whether the DMDF fully complied with the 2013 Principles when it conducted its "public interest" review.

149.     On information and belief, the Corps has not amended the DMMP/EIS to address the goals and requirements of the 2022 Interim Guidance.

150.     The Corps' decision to construct the DMDF at the CDF site ignores the needs of disadvantaged communities in violation of its own environmental justice policy and the Justice40 Initiative established in the 2022 Interim Guidance.

151.     The Corps' approval of the DMDF project in its Record of Decision violated binding 404(b)(1) Guidelines, was thus arbitrary and capricious and contrary to law under 5 U.S.C. § 706, and therefore must be set aside.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs respectfully request that this Court issue an Order granting the following relief:

A.      Declare that the Defendant Corps' Record of Decision approving and making a finding of adequacy of the final EIS for the DMDF violated NEPA in multiple respects and, therefore, was "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law" under the APA.

B.      Declare that the Defendant Corps' plan to construct and operate the DMDF is "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations" because its non-Federal sponsors do not have legal authority to grant "all necessary lands, easements, relocations, and rights-of-way associated with" the facility. and would violate the public trust doctrine.

C.      Vacate the Defendant Corps' Record of Decision finding the final EIS to be adequate.

D.      Vacate the Defendant Corps' DMMP/EIS.

E.      Enjoin the Defendant Corps from proceeding with carrying out its Dredged Material Management Plan.

F.      Award Plaintiffs' attorney fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412, under the Clean Water Act, 33 U.S.C. § 1365(d), and under other applicable laws.

G.      Grant such further relief as may be just, equitable and appropriate.

Respectfully submitted,


*/s/ Michael J. Zoeller*
HOWARD A. LEARNER
MICHAEL J. ZOELLER
TANMAY SHUKLA
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1600
Chicago, IL  60601
(312) 795-3704 (Learner)
(202) 244-2338 (Zoeller)
(312) 673-6500 (Shukla)
hlearner@elpc.org
mzoeller@elpc.org
tshukla@elpc.org

*Counsel for Plaintiffs*
*Alliance of the Southeast*
*Friends of the Parks*