**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ALLIANCE OF THE SOUTHEAST and FRIENDS OF THE PARKS, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 23-1524 Honorable Thomas M. Durkin |
| UNITED STATES ARMY CORPS OF ENGINEERS et al., | ) ) ) | |
| Defendants. | ) ) | |

---

**PLAINTIFFS' MEMORANDUM
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

---

HOWARD A. LEARNER
DANIEL ABRAMS
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1600
Chicago, IL 60601
(312) 673-6500
hlearner@elpc.org
dabrams@elpc.org

Attorneys on behalf of
Plaintiffs Alliance of the Southeast
and Friends of the Parks

Dated: December 12, 2023

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................................ 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ..................................................... 5

    Chicago's Southeast Side Environmental Justice Community, and the Defendant Corps'
    Toxic Dredged Waste Dump on the Lake Michigan Shoreline ...................................... 5

    The Corps' Decision to Build a New DMDF on Top of the CDF and Continue Its Toxic
    Dredged Wastes Dumping There for at least 20 More Years ........................................ 8

    Procedural History and Status of this Lawsuit ................................................... 10

ARGUMENT ............................................................................................. 11

    I. STANDARD OF REVIEW ........................................................................... 11

    II.   THE CORPS DOES NOT HAVE THE REQUIRED LAND RIGHTS FROM
        ILLINOIS TO BUILD ITS PROPOSED NEW TOXIC WASTE DUMP HILL ON
        LAKE MICHIGAN LAKEBED HELD IN THE PUBLIC TRUST ............................. 12

        A.  The Defendant Corps Has Not Obtained Statutory Authority for the Land Rights It
           Needs to Build Its New Toxic Dredged Waste Dump Hill on Lakebed .................. 13

        B.  The 1982 Illinois Legislation Cannot Be Lawfully Read to Authorize the Corps to
           Construct the DMDF Without Violating the Public Trust Doctrine ........................ 14

    III.  THE CORPS' ENVIRONMENTAL IMPACT STATEMENT DOES NOT COMPLY
         WITH SEVERAL NEPA LEGAL REQUIREMENTS ........................................... 17

        A.  The EIS Fails to Analyze the Climate Change Impacts of Rising Lakewater Levels
           and Storm Surge Waves on the Proposed New Toxic Waste Dump ...................... 19

        B.  The DMMP/EIS Fails to Analyze the Adverse Cumulative Impacts of the DMDF in
           Combination with Other Polluting "Past, Present and Reasonably Foreseeable"
           Projects in the Southeast Chicago Area ................................................... 21

        C.  The DMMP/EIS Fails to Adequately Analyze the Disproportionate and Cumulative
           Adverse Impacts of the DMDF on the Southeast Chicago Environmental Justice
           Community .............................................................................. 23

        D.  The DMMP/EIS Fails to Comply with the NEPA Requirement that the Corps
           Rigorously Explore and Objectively Evaluate All Reasonable Alternatives, and
           Adopted an Improperly Narrow "Purpose and Need" Statement .......................... 25

        E.  The DMMP/EIS Improperly Skews Its Limited Alternatives Analysis to Favor the
           Lakefront Site on Top of the CDF ......................................................... 27

    IV.  THE CORPS' DECISION APPROVING THE NEW TOXIC DUMP VIOLATES THE
         CLEAN WATER ACT ............................................................................. 29

        A.  The Corps Did Not and Could Not Determine that Building the DMDF on Top of
           the Current Disposal Site is the Least Environmentally Damaging Practicable
           Alternative for Managing Dredged Waste Materials ..................................... 29

B.  Construction and Operation of the DMDF Will Have Disproportionate Adverse Impact on An Environmental Justice Community and Is Therefore "Contrary to the Public Interest"........................................................................................... 31

V.  PLAINTIFFS HAVE STANDING ............................................................................... 33

CONCLUSION ...................................................................................................................... 35

# TABLE OF AUTHORITIES

### Cases

*Andrus v. Sierra Club*, 442 U.S. 347 (1979)............................................................................ 21

*AquAlliance v. U.S. Bureau of Reclamation*, 287 F. Supp. 3d 969 (E.D. Cal. 2018) .................. 23

*Bersani v. U.S. EPA*, 850 F.2d 36 (2d Cir. 1988) ...................................................................... 37

*Demos v. City of Indianapolis,* 302 F.3d 698, 706 (7th Cir. 2002)............................................... 8

*Fox Bay Partners v. U.S. Army Corps of Eng'rs,* 831 F. Supp. 605 (N.D. Ill. 1993)................... 39

*Friends of the Earth v. Laidlaw Env't Servs.,*528 U.S. 167 (2000) ............................................ 43

*Friends of the Parks v. Chicago Park Dist.*, 160 F. Supp. 3d 1060 (N.D. Ill. 2016).... 2, 17, 18, 19

*Friends of the Parks v. Park. Dist.,* 203 Ill.2d 312, 786 N.E.2d 161 (2003) ................................ 18

*Getty v. Fed. Sav. & Loan Ins. Corp.,* 805 F.2d 1050 (D.C. Cir. 1986) ...................................... 13

*Habitat Educ. Center,* 363 F. Supp 2d. 1090 (E.D. Wis. 2005) ............................................ 26, 27

*Habitat Educ. Ctr. v. Bosworth*, 363 F. Supp. 2d 1070 (E.D. Wis. 2005)................. 22, 23, 26, 27

*Habitat Educ. Ctr. v. Bosworth*, 381 F. Supp. 2d 842 (E.D. Wis. 2005).................................... 27

*Hunt v. Washington State Apple Advert. Comm'n,* 432 U.S. 333 (1977) ...................................... 42

*Illinois Central Railroad Company v. Illinois,* 146 U.S. 387 (1892)........................................... 17

*Indiana Forest Alliance. v. U.S. Forest Serv.,* 325 F.3d 851 (7th Cir. 2003) ............................... 43

*Jam v. Int'l Fin. Corp.,* 139 S. Ct. 759 (2019)............................................................................ 15

*Kisor v. Wilkie,* 139 S. Ct. 2400 (2019).................................................................................... 13

*Kleppe v. Sierra Club,* 427 U.S. 390 (1976)............................................................................... 26

*La. Wildlife Fed'n v. York*, 761 F.2d 1044 (5th Cir. 1985)......................................................... 38

*Lake Mich. Fed'n. v. U.S. Army Corps of Eng'rs,* 742 F. Supp. 441 (N.D. Ill. 1990) 2, 16, 17, 18, 19, 20

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992) .................................................................. 43

*Maniilaq Association v. Burwell,* 72 F.Supp.3d 227 (D.D.C. 2014) ........................................... 13

*Menominee Indian Tribe v. Thompson,* 161 F.3d 449, 456 (7th Cir.1998) ................................... 8

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm,* 463 U.S. 29 (1983).............. 13, 31, 34, 35

*Navajo Nation v. Azar,* 302 F.Supp.3d 429 (D.D.C. 2018) ........................................................ 13

*Newcomb v. Brennan*, 558 F.2d 825, 829 (7th Cir. 1977) ............................................................ 8

*Openlands v. United States Dep't Transportation, 124 F. Supp. 3d 796 (N.D. Ill. 2015)*22, 23, 34, 35

*Paepcke v. Pub. Bldg. Comm'n of Chicago*, 263 N.E.2d 11 (1970).............................................. 19

*People ex rel. Scott v. Chicago Park Dist.,* 66 Ill.2d 65 (1976) ............................................. 18, 20

*Protect Our Parks, Inc. v. Buttigeig,* 2022 WL 910641 (N.D. Ill. Mar. 29, 2022)...................... 18

*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs,* 826 F.3d 1030 (8th Cir. 2016) ........................................................................................................................................ 44

*Robertson v. Methow Valley Citizens Council,* 490 U.S. 332 (1989)........................................... 20

*Shoreline Assocs. v. Marsh*, 555 F. Supp. 169 (D. Md. 1983)............................................... 37, 38

*Sierra Club v. Fed. Energy Reg. Comm'n*, 867 F.3d 1357 (D.C. Cir. 2017) ............. 21, 23, 26, 30

*Sierra Club v. U.S. Dep't of Transp.,* 962 F. Supp. 1037 (N.D. Ill. 1997) 22, 23, 24, 25, 26, 34, 35

*Simmons v. U.S. Army Corps of Eng'rs,* 120 F.3d 664 (7th Cir. 1997)........... 5, 22, 24, 32, 34, 37

*Sylvester v. U.S. Army Corps of Eng'rs*, 882 F.2d 407 (9th Cir. 1989)....................................... 38

*TransUnion LLC v. Ramirez,* 141 S. Ct. 2190 (2021) ................................................................ 41

*United States v. Alaska,* 503 U.S. 569 (1992)............................................................................ 40

*Utahns for Better Transp. v. Dept. of Transp.*, 305 F.3d 1152 (10th Cir. 2002) ......................... 37

*Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321 (D.C. Cir. 2021) . 24, 25, 30, 31
*WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41 (D.D.C. 2019).................................. 21, 23, 26
*Wis. Cent. Ltd. v. Surface Transp. Bd.*, 112 F.3d 881, 887 (7th Cir. 1997)................................. 13

### Statutes

1346............................................................................................................................................. 11
28 U.S.C. § 1391 ...................................................................................................................... 11
28 U.S.C. §§ 1331 ..................................................................................................................... 11
33 U.S.C. § 1344 .................................................................................................................... 5, 29
33 U.S.C. § 2326a(c)........................................................................................................ 4, 10, 12
42 U.S.C. § 4321 et. seq. ............................................................................................................. 4
42 U.S.C. § 4332 .................................................................................................... 5, 18, 19, 25
42 U.S.C. § 4344 ....................................................................................................................... 24
5 U.S.C. §§ 701–706 ............................................................................................ 5, 11, 12, 19, 33
70 Ill. Stat. § 1505/7 ................................................................................................................. 14
84 Stat. 1818, 1823 (1970) ................................................................................................... 7, 13

### Other Authorities

CEQ, *Environmental Justice Guidance Under the National Environmental Policy* Act, 10 (Dec. 10, 1997) .............................................................................................................................. 24
CEQ, *National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change, Section V—Considering the Effects of Climate Change on a Proposed Action,* 88 Fed. Reg. 1196, 1207-10 (July 9, 2023)................................................ 20
Climate and Economic Justice Screening Tool, 87 Fed. Reg. 10176 (Feb. 23, 2022) ................. 6
*EPA Legal Tools to Advance Environmental Justice* 83 (May 2022) ......................................... 32
Exec. Order No. 12898, *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations*, 59 Fed. Reg. 7629 (Feb. 16, 1994)............... 23, 24
Exec. Order No. 14008, *Tackling the Climate Crisis at Home and Abroad*, 86 Fed. Reg. 7619, 7629 (Feb. 1, 2021) ............................................................................................... 2, 24, 33
Exec. Order No. 14096, *Revitalizing Our Nation's Commitment to Environmental Justice for All*, 88 Fed. Reg. 25251 (April 23, 2023) ...................................................................... 3, 23, 24, 33

### Rules

Fed. R. Civ. Pro. 56(a) ............................................................................................................. 11

### Regulations

33 C.F.R. § 320.4(a)(1).................................................................................... 5, 12, 29, 31, 32
33 C.F.R. § 323.2 ....................................................................................................................... 31
33 C.F.R. Part 335..................................................................................................................... 29
40 C.F.R § 1502.16 (2019) ..................................................................................... 4, 18, 19, 23
40 C.F.R § 1508.7 (2019) ............................................................................. 5, 19, 21, 22, 23, 25
40 C.F.R. § 1502 ........................................................................................................................ 18
40 C.F.R. § 1502.13 ................................................................................................................... 19
40 C.F.R. § 1506.1(a) (2019) .................................................................................................... 19
40 C.F.R. § 230.10 ...................................................................................................................... 5
40 CFR § 1502.14 (2019) ............................................................................. 5, 19, 20, 25
47 Fed. Reg. 31794, 31799 (July 22, 1982).............................................................................. 31
87 Fed. Reg. 23453, 23459 (April 20, 2022) ...................................................................... 21, 26

iv

*National Environmental Policy Act Implementing Regulations Revisions Phase 2*, 88 Fed. Reg. 49924, 49967 (July 31, 2023) ................................................................................................ 20

## INTRODUCTION AND SUMMARY OF ARGUMENT

Chicago's Southeast Side and 10th Ward are recognized as "environmental justice" communities by the federal government because of the legacy of toxic waste dumping and ongoing toxic contamination threatening public health and the environment. The Defendant U.S. Army Corps of Engineers ("Corps") so concedes. Doc. 15 at 25.[1] Plaintiffs Alliance of the Southeast's and Friends of the Parks' members live, work and play in this community.

Despite the Biden Administration's stated commitment to environmental justice, however, the Corps now proposes to build a 25-foot--high, towering, toxic dredged waste dump on top of its existing toxic dump site—the confined disposal facility ("CDF"). The CDF is on the Lake Michigan shoreline immediately north of Calumet Park, which is used and enjoyed by Southeast Side residents and many other Chicagoans. The CDF was built pursuant to Illinois legislation enacted in 1982, which allowed limited use of lakebed held in the "public trust" for that specific landfill for a ten-year time period, which has long ended. Defendant used the CDF to dump toxics-laden sediment dredged from the Calumet River and Harbor to facilitate commercial barge shipping. The expectation of all parties was that the CDF, when filled, would be capped and restored as a public park for community residents to enjoy. That time is now.

The CDF operated for forty years and is now filled. Instead of restoring and turning over the property for the new lakefront park, the Corps instead wants to construct its new toxic dredged waste dump—the Dredged Material Disposal Facility ("DMDF")—on this site for at least another twenty years. The Corps' proposed new DMDF and its Record of Decision approving the unduly constricted Environmental Impact Statement violate multiple federal and

---

[1] Documents in the Court's docket are cited "Doc.__." Documents in the Administrative Record are cited "AR __." Plaintiffs are providing a short appendix of standing declarations and Illinois state documents which are cited "PApp. __."

state laws, and are contrary to common sense. For the reasons explained below, the Court should grant summary judgment in Plaintiffs' favor, invalidate and set aside the Corps' actions, reverse and remand, and enjoin the Corps from building its *ultra vires* proposed new toxic wastes dump.

The submerged lakebed on which the CDF sits is held in trust for the people of Illinois. Any use must be explicitly approved by the Legislature and provide direct public benefits. The Illinois General Assembly has not enacted legislation since 1982 that would allow this new toxic waste dump on the public trust lakebed here. *See Lake Mich. Fed'n. v. U.S. Army Corps of Eng'rs*, 742 F. Supp. 441 (N.D. Ill. 1990) (granting plaintiff's injunction because property to be used for lakefill was conveyed in violation of public trust); *Friends of the Parks v. Chicago Park Dist.*, 160 F. Supp. 3d 1060 (N.D. Ill. 2016) (public trust doctrine applied against proposed lakefront Museum that would impair public interest and promote commercial interests).

Since the 1982 legislation for the now-filled CDF, the impacts of climate change on Lake Michigan are better understood and more pervasive. Climate change is causing more extreme water levels and more intense storms with high winds that whip up heavy waves battering the Chicago shoreline.[2] The Corps ignored these impacts despite a recommendation from its own independent peer reviewer to "[e]xplicitly assess and estimate possible effects on [the DMDF project] from climate change, including the effects of lake levels, waves, and increases in rainfall events and their intensity upon the [facility] or new berm walls, ...." AR 032584.

The federal government committed to prioritizing environmental justice, in areas like the Southeast Side, in all decision-making processes. Exec. Order No. 14008, *Tackling the Climate Crisis at Home and Abroad*, 86 Fed. Reg. 7619, 7629 (Feb. 1, 2021), establishes the "Justice40 Initiative" in Section 223 as a whole-of-government approach to advance environmental justice.

---

[2]*See* https://bit.ly/46Qg7FS and https://toolkit.climate.gov/regions/great-lakes

"The task of delivering the benefits of hundreds of Federal programs to communities that are marginalized and overburdened by pollution requires reforms to the very way in which the Federal Government operates." *Justice40, A Whole-of-Government Initiative*, https://www.whitehouse.gov/environmentaljustice/justice40/. The Order states in Section 219:

> Agencies shall make achieving environmental justice part of their missions by developing programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related and other cumulative impacts on disadvantaged communities, as well as the accompanying economic challenges of such impacts. It is therefore the policy of my Administration to secure environmental justice and spur economic opportunity for disadvantaged communities that have been historically marginalized and overburdened by pollution and underinvestment in housing, transportation, water and wastewater infrastructure, and health care.

Subsequently, the Administration published Exec. Order No. 14096, *Revitalizing Our Nation's Commitment to Environmental Justice for All*, 88 Fed. Reg. 25251 (April 21, 2023), which states that: "[r]estoring and protecting a healthy environment is a matter of justice and a fundamental duty that the Federal Government must uphold on behalf of all people. We must advance environmental justice for all by implementing and enforcing the Nation's environmental and civil rights laws, preventing pollution, addressing climate change and its effects, and working to clean up legacy pollution that is harming human health and the environment."

The world has changed since the 1982 legislation allowing the CDF to be built on public trust lakebed. Climate change impacts are more real, better known, and must be more fully considered. Toxic threats to public health are better understood. The disproportionate concentration of toxic pollution and harms on environmental justice communities are recognized, provided new federal legal protection, and are of greater public concern.

The Corps nonetheless wants to do its same old—same old approach. Without further Illinois legislative approval, the Corps would add more toxic wastes in a towering 25-foot-high

dump along the lakefront in this environmental justice community already overburdened by toxic pollution, and without fully and fairly analyzing alternative sites outside the Southeast Side—10th Ward area. The Corps' approach is contrary to law and would deprive community residents of the long-promised new 40+ acre public lakefront park after the now-full CDF is safely capped and restored. Plaintiffs are entitled to summary judgment for the following reasons:

*First,* the Defendant Corps' violations of law are not entitled to deference under the applicable standard of review. *See* Part I, *infra.* **Second,** the Corps does not have land use rights from a "non-federal sponsor" to further use Lake Michigan lakebed for its new DMDF. 33 U.S.C. § 2326a(c). The 1982 Illinois legislation allowing the Corps to build the existing CDF was limited to ten years, and there has been no subsequent legislation. Illinois did not somehow confer open-ended permission for the Corps' use of lakebed to serve private commercial barge interests. That interpretation would violate the public trust doctrine. *See* Part II, *infra.*

*Third,* the "Dredged Material Management Plan and Integrated Environmental Impact Statement" ("DMMP/EIS") violates legal requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., and its applicable regulations. *Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664 (7th Cir. 1997). The DMMP/EIS does not take the required "hard look": (a) analyzing climate change impacts of more extreme lake water levels and intensive storm wave surges battering the Lake Michigan shoreline, 40 C.F.R. § 1502.16 (2019)[3]; 40 C.F.R. §1508.8 (2019, now codified at 40 C.F.R. 1508.1(g)(2)); (b) analyzing "cumulative impacts" on the environment, resulting from "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal

---

[3] This language reflects the 2019 CEQ Regulations in effect at the time of the EIS and prior to the Trump Administration's revisions. This language is being reinstated. CEQ, *National Environmental Policy Act Implementing Regulations Revisions Phase 2,* 88 Fed. Reg. 49924, 49948, 49977 (July 31, 2023).

or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.25 (2019, now codified at 40 C.F.R. § 1501.9); 40 C.F.R. § 1508.7 (2019, now codified at 1508.1(g)(3)); (c) analyzing disproportionate impacts on environmental justice communities surrounding the new toxic dump, 42 U.S.C. § 4332 (2019) (d) "rigorously exploring and objectively evaluating all reasonable alternatives" except for sediment disposal sites in the 10th Ward, 40 C.F.R. § 1502.14 (2019); and (e) by impermissibly skewing the analysis to favor its preferred site. *Id. See* Part III, *infra.*

**Fourth,** the Corps violated the Clean Water Act's binding Section 404(b)(1) Guidelines, 33 U.S.C. § 1344(b)(1), because: (a) it failed to adequately analyze whether the proposed DMDF is the "least environmentally damaging practicable alternative"; and (b) the DMDF's disproportionate adverse impact on an already overburdened environmental justice community is "contrary to the public interest." 40 C.F.R. § 230.10; 33 C.F.R. § 320.4(a)(1). *See* Part IV, *infra.*

**Fifth,** Plaintiffs have organizational standing, and their community members have standing. Their members are exposed to toxic risks, and will suffer injuries in fact due to the new toxic waste dump, as their standing affidavits explain. PApp. 86-125. Their injuries are redressable by summary judgment. *See* Part V, *infra.* No materials facts are in dispute. The Court should grant summary judgment in Plaintiffs' favor and provide declaratory and injunctive relief.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

### Chicago's Southeast Side Environmental Justice Community, and the Defendant Corps' Toxic Dredged Waste Dump on the Lake Michigan Shoreline

This case is a civil action for declaratory and injunctive relief under the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, challenging the Defendant U.S. Army Corps of Engineers' final actions to build its proposed new DMDF, a 25-foot-high toxic dredged wastes dump on top of the existing CDF toxic dredged wastes disposal

5

dump along the Lake Michigan shoreline on the Southeast Side of Chicago. Doc. 1 at 1-5. The CDF is located on submerged Lake Michigan lakebed, which the State of Illinois holds in public trust for the benefit of its citizens and to protect Lake Michigan waters and vital natural resources. *Id*. at 2. The CDF is now full. Doc. 15 at 3-4. Plaintiffs Alliance of the Southeast and Friends of the Parks are not-for-profit community, parks and environmental advocacy and education organizations whose members live, work, and recreate in the Southeast Side in the neighborhoods near the proposed new DMDF toxic dump and the CDF. Doc 1 at 7-8; PApp. 86-125. The Defendants are the Corps and its officials. Doc 1 at 9.

The Southeast Side, including Chicago's 10th Ward, is a lower-income and working-class neighborhood made up primarily of Latino and Black residents. AR 038236. This environmental justice community has "a long history of hazardous, toxic, or radioactive waste contamination." AR 034226; AR 034279-034284; AR 038235, 038239; Doc. 15 at 25. The federal government's Climate and Economic Justice Screening Tool, 87 Fed. Reg. 10176 (Feb. 23, 2022), recognizes the Southeast Side as an "environmental justice community" most impacted by climate change, pollution, and environmental hazards. All of the census tracts near Calumet Park are overburdened by toxic pollution. https://screeningtool.geoplatform.gov/en/#11.02/41.6974/-87.5357.

From time-to-time, the Corps dredges the Calumet River and Harbor to facilitate commercial barge shipping. The dredged sediments contain arsenic, barium, cadmium, chromium, copper, lead, manganese, mercury, nickel, zinc, polychlorinated biphenyls ("PCBs"), and other toxic contaminants. Doc. 15 at 25; AR 034208. In the early 1980's, the Corps decided to build the CDF for these toxic dredged sediments on a lakefront site immediately north of Calumet Park. Doc. 1 at 5; AR 003227. The site is "public trust" property. So, in 1982, the Corps requested that the Illinois General Assembly enact legislation conveying the State's right, title,

6

and interest in the lakebed site to the Chicago Park District for "the improvement of certain harbor and park facilities, in order to further the public interest and benefit navigation, including the construction, use, and maintenance upon such land of a confined disposal facility, as contemplated by [federal] Section 123 of Public Law 91-611." Pub. Act 82-770.[4] Doc. 1 at 2-3. Section 123 amended the federal Rivers and Harbors Act, however, to allow facilities to only hold ten years of dredged materials. *Id.* § 123(a), 84 Stat. 1818, 1823 (1970). The General Assembly thus expected that the CDF site would be capped and restored into a new lakefront park for community residents to enjoy. The legislation's principal sponsor stated:

> [O]ver a ten year period . . . the dredging would take ten years, they would fill in this facility with the dredgings from the River which, ultimately, would result in 40 acres of additional . . . Chicago Park District land for Calumet Park. So . . . in ten years we would have our River dredged, and we would have 40 acres of new park land.[5]

Under that statutory authority, the Corps received a "right to enter" the lakebed site for the CDF, while acknowledging that Section 123 only authorized a facility "of sufficient capacity to contain the deposits of dredged materials for a period not to exceed 10 years." AR 003852. The Corps recognized that the CDF was "intended [by statute] to confine contaminated material dredged from the affected federal navigation channels for a period of 10 years," AR 034241, and then it was to be "maintained in perpetuity as open space or parkland." AR 034294.

---

[4] This Court can take judicial notice of the Illinois legislation "because a district court can always rely on public statutes." *Demos v. City of Indianapolis,* 302 F.3d 698, 706 (7th Cir. 2002). The text of the Illinois legislation is included in Plaintiffs' Appendix at PApp. 2.

[5] 82nd Ill. Gen. Assembly, House Proceedings, May 3, 1982, at PApp. 59 (statement of Rep. Collins) (available at https://perma.cc/66SP-UV8C). This Court can take judicial notice of the Illinois legislative history as a "matter[] of public record … within the category of 'common knowledge.'" *Newcomb v. Brennan*, 558 F.2d 825, 829 (7th Cir. 1977); *see Menominee Indian Tribe v. Thompson,* 161 F.3d 449, 456 (7th Cir.1998)

**The Corps' Decision to Build a New DMDF on Top of the CDF and Continue Its Toxic Dredged Wastes Dumping There for at least 20 More Years**

The Corps has been using the CDF since 1984, and there has been no subsequent Illinois legislation authorizing the right to further use the CDF on this public trust lakebed or to build the DMDF on top. Doc. 1 at 3-4. The CDF is now full, Doc. 15 at 2-3, and since 1984, the Corps had ample opportunity to prepare for closing the CDF and exploring alternative locations for future dredged waste. Instead, the Corps proposes to build a new 25-foot high towering hill of toxic dredged wastes on top of the existing CDF. AR 034156.

The Corps' Dredged Material Management Plan and Integrated Environmental Impact Statement ("DMMP/EIS") identifies a goal of evaluating "alternatives to manage the volume of dredged material expected to be generated by the operation and maintenance (O&M) of [Calumet Harbor and River and the Cal-Sag Channel] over a 20-year period." AR 034182. The only alternatives given serious consideration, however, were "expanding the existing Chicago Area CDF" or "locations along the Calumet Harbor and River for the construction of a new sediment management facility." AR 034160. All of these alternatives are in Chicago's 10th Ward on the Southeast Side. AR 034265. The DMMP/EIS dismissed other alternatives like upland landfills outside the 10th Ward, other disposal facilities with existing capacities, source reduction, or beneficial use, primarily because they would likely cost more, and the proposed new DMDF was easier. AR 034244-034248. The DMMP/EIS acknowledges that the Corps' preferred DMDF site adjoins overburdened environmental justice communities, AR 034222, but it dismisses those concerns by noting that these neighborhoods are near the dredging. AR 038231. The DMMP/EIS likewise dismisses the additional twenty years of delay for the promised park expansion as "insignificant." AR 034301, 034304.

The Corps conceded "legitimate concerns" from the community in delaying the promised park, AR 034304, but concluded that because the park will be built "eventually" – namely after 20 years or more of continued toxic waste dumping at the DMDF – there will be no "permanent negative impacts on socio-economic resources." AR 034304, 034161. The DMMP/EIS assigned zero negative cumulative effect to the loss of promised parkland and continuation of a contaminated disposal facility in an environmental justice community for at least another two decades. AR 034304. Likewise, the Corps assigned no substantive negative aesthetic impact for its recommended 25-foot-high toxic waste dump towering hill. AR 034286.

The Corps' DMMP/EIS did not consider the impacts of climate change on a Lake Michigan, shoreline toxic waste dump hill, despite recognizing that climate change impacts caused increasingly destructive storm-surges, high winds and heavy waves, flooding, and coastline erosion. AR 034217. The Corps retained an independent external peer review panel because the "risk and magnitude of the proposed project" warranted a "critical examination by a qualified team" led by the Battelle Memorial Institute. AR 034203. The team had "independent, recognized experts from outside [the Corps] in the appropriate disciplines, representing a balance of areas of expertise suitable for the review being conducted." *Id.* These peer reviewers stated that the DMMP/EIS did not "assess and estimate possible effects on [the DMDF project] from climate change, including the effects of lake levels, waves, and increases in rainfall events and their intensity upon the [facility] or new berm walls, as well as the effects of lower water levels on dredging quantities," and encouraged the Corps to do that analysis. AR 032584. The Corps did not do that climate change impacts analysis and did not mention other vital environmental considerations, including the structural integrity of the facility, risk of pollutant breach or

increased maintenance costs from lake surge, AR 034275, and decided to build on top of the CDF site on Lake Michigan shoreline public trust property. AR 034299-034304.

Plaintiffs, several of their members, and other environmental and community groups filed public comments on the Corps' draft DMMP/EIS in which they challenged the truncated review of alternatives, the absence of any thorough review of the disproportionate or cumulative impacts the new facility would have on environmental justice communities, and the conclusion to build the new toxic dredged waste dump on top of the now-filled CDF, thereby precluding the long-promised public parkland for more than 20 years or longer. AR 032522-032560. The Corps made no significant changes in its plans or the DMMP/EIS in response to the public comments. The Corps issued its Final DMMP/EIS on August 1, 2020, AR 034147-034334, and its Record of Decision approving the Final DMMP/EIS on September 15, 2020. AR 038550-38561.

### Procedural History and Status of this Lawsuit

Plaintiffs filed the Complaint challenging the Defendants' decisions approving the new DMDF and the Record of Decision because they violated multiple federal legal requirements in the Corps' authorizing legislation, 33 U.S.C. § 2326a(c), in NEPA, and in the rules governing Corps projects under Section 404 of the Clean Water Act. Doc. 1. Plaintiffs further contended that the Corps' decision to construct and operate the DMDF without the Illinois legislature's further approval violates the requirements of its federal authorizing legislation, 33 U.S.C. § 2326a(c), because it lacks the necessary land use rights. Any purported grant of land use rights by the Chicago Park District to the Corps for purposes of the DMDF is *ultra vires* use of public trust property by a state agency in violation of the terms of Illinois Public Act 82-770 and the Illinois public trust doctrine. Doc 1 at 4, 6 and 23-25. Plaintiffs requested that the Corps' decisions and approvals be set aside, declared invalid and contrary to law, be reversed and remanded, and that construction be enjoined unless and until the Corps obtains necessary land

rights, and complies with its authorizing legislation, NEPA, the Clean Water Act, and other applicable state laws including the public trust doctrine. *Id*. Defendants answered the Complaint on May 30, 2023 (Doc. 15), and lodged the Administrative Record on July 28, 2023. Doc. 18. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346, and venue is proper in this district, pursuant to 28 U.S.C. § 1391(b)(1), (b)(2), and (e)(1). Doc. 1 at 6-7.

At a status hearing before the Court on April 25, 2023, the parties addressed the issue that the Corps did not yet have the state permits required in order to begin construction of the DMDF. Doc. 17 at 28. Illinois EPA later that day advised the Court that its permitting decisions are not imminent. PApp. 126. No state permits have since been issued by the Illinois EPA. The case is now before the Court on cross-motions for summary judgment.

## ARGUMENT

Plaintiffs challenge the Corps' actions to site a towering new toxic dredged waste dump along the Lake Michigan shoreline in an environmental justice community. Because the Corps is violating federal law, the Court should grant Plaintiffs' motion for summary judgment.

### I.    STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Judicial review of federal agency actions under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, can be resolved as a matter of law. "In an Administrative Procedure Act Case, summary judgment 'serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review.'" *Navajo Nation v. Azar*, 302 F.Supp.3d 429, 435 (D.D.C. 2018).

Courts are obligated to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not

accordance with law." 5 U.S.C. § 706(2). An action is arbitrary and capricious if it fails to analyze important aspects of the problem. *Motor Vehicle Mfrs. Ass'n. v. State Farm*, 463 U.S. 29, 43 (1983). "Stating that a factor was considered . . . is not a substitute for considering it." *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986). Questions of law are for courts to decide. *See e.g., Wis. Cent. Ltd. v. Surface Transp. Bd.*, 112 F.3d 881, 887 (7th Cir. 1997); *Maniilaq Association v. Burwell*, 72 F.Supp.3d 227, 234 (D.D.C. 2014). Reviewing courts owe no deference to agency interpretations of the law, except under limited circumstances that do not apply here. *See generally Kisor v. Wilkie*, 139 S. Ct. 2400 (2019). Deference cannot save agency decision-making that violates numerous federal and state environmental laws.

**In Part II** below, we explain that the Corps lacks the necessary land rights from a non-federal sponsor to lawfully proceed (33 U.S.C. § 2326a(c)) because the 1982 Illinois legislation explicitly restricted the CDF to ten years, and any open-ended interpretation would violate public trust law. **In Part III**, we explain the multiple ways the Corps' environmental impact statement violates NEPA. **In Part IV**, we explain the Corps' violation of the Clean Water Act, 40 C.F.R. §230.10; 33 C.F.R. § 320.4(a)(1). **In Part V**, we explain that Plaintiffs have standing.

## II. THE CORPS DOES NOT HAVE THE REQUIRED LAND RIGHTS FROM ILLINOIS TO BUILD ITS PROPOSED NEW TOXIC WASTE DUMP HILL ON LAKE MICHIGAN LAKEBED HELD IN THE PUBLIC TRUST

The federal legislation authorizing the Corps to construct a DMDF requires the agency to obtain "all necessary lands, easements, relocations, and rights-of-way associated with the facility" from a non-federal partner. 33 U.S.C. § 2326a(c). That has not happened here. *First*, while the Illinois General Assembly did authorize temporary use of the lakebed for the CDF back in 1982, that was specifically limited to ten years. The General Assembly has not passed subsequent legislation. *Second*, even if the lack of authorization could be overlooked,

interpreting the 1982 Illinois legislation to somehow allow the Corps to build a new toxic dredged waste dump on the lakebed would violate the Illinois public trust doctrine.

**A. The Defendant Corps Has Not Obtained Statutory Authority for the Land Rights It Needs to Build Its New Toxic Dredged Waste Dump Hill on Lakebed**

In 1982, the Illinois General Assembly authorized the Chicago Park District to convey a "right to enter" to the Corps to build the existing CDF. The 1982 statute was, however, limited to ten years, and cannot be fairly read to allow a new 25-foot-high toxic dredged waste dump more than 40 years later. Having been given the proverbial inch, the Corps now wants to take a mile.

The 1982 Illinois legislation was clearly time-limited. The Act declared the land is "for the improvement of certain harbor and park facilities, in order to further the public interest and benefit navigation, including the construction, use and maintenance upon such land of a contained spoil disposal facility as contemplated by Section 123 of Public Law 91-611." Illinois Pub. Act 82-770, § 1-1; *see* PApp. 2. Section 123 of Public Law 91-611 is a federal statute which states that the Corps "is authorized to construct, operate, and maintain . . . contained spoil disposal facilities," but only of "sufficient capacity *for a period not to exceed ten years* . . . ." 84 Stat. 1818, 1823 (1970) (emphasis added). The Illinois statute expressly incorporates that time limitation from the federal statute. *See Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 769 (2019) (under "reference" canon, statutes that reference specific titles incorporate the referenced language verbatim). The Illinois statute's plain text does not authorize conveying land rights beyond ten years, and it certainly does not authorize conveying land rights for this *new* toxic dump to be built 40 years later, and to operate for at least 20 more years. References to specific titles in other statutes, as opposed to references to general laws, do *not* incorporate future amendments. *Id.*

The 1982 legislation also expressly states the twin goal of "the improvement of certain harbor *and* park facilities." *See* PApp. 2. The CDF, when filled, was intended to be capped and

the site restored to create a new lakefront park for community residents to use and enjoy. AR 034294. The 1982 legislative debate captures this understanding. The Illinois House sponsor stated this intent: "in ten years we would have our River dredged, and we would have 40 acres of new park land." PApp. 59. The transaction would ensure "the continued viability of the Chicago Regional Port District," while creating "additional recreational lands for the people in Chicago and the Chicago Park District . . . ." *Id.* at 61. That the Legislature conveyed the lakebed to the Chicago *Park* District, which builds and maintain parks, 70 Ill. Stat. § 1505/7, and *not* to the Chicago Regional Port District, further evidences the new park intent.

The Park District's 1982 documents reflect a similar understanding. The CPD's Resolution No. 11 (July 30, 1982) provides for a right of entry for the United States, "for a period not to exceed ten years or until the [CDF] is filled, whichever occurs later." AR 003872.

The Corps' own documents recognize that its right to operate the CDF was term-limited. "When filled to capacity the CDF will be capped, seeded, and turned over to the local sponsors [Chicago Park District]." AR 005508. The Corps' DMMP/EIS recognizes that confined disposal facilities were "intended [by statute] to confine contaminated material dredged from the affected federal navigation channels for a period of 10 years," AR 034241, and that the site has "strict future use restrictions" to be "maintained in perpetuity as open space or parkland." AR 034294. The Corps concedes: "[t]he lands were to have been turned over to the Chicago Park District once the existing CDF closed." AR 038030. Because the Illinois Legislature has not provided new statutory authorization, the Corps lacks the required land rights to build its new DMDF.

### B. The 1982 Illinois Legislation Cannot Be Lawfully Read to Authorize the Corps to Construct the DMDF Without Violating the Public Trust Doctrine

The 1982 Illinois legislation must be read in conjunction with the public trust doctrine because submerged or previously submerged Lake Michigan lakebed, like the land underlying

14

the CDF, is held in "public trust" for the public and for protection of vital natural resources. *Lake Mich. Fed'n*, 742 F. Supp. at 444; *Friends of the Parks v. Chicago Park Dist.*, 160 F. Supp. 3d at 1067. Any delegation of public trust land must benefit the public directly, not incidentally, and "any attempt by the state to relinquish its power over a public resource should be invalidated under the doctrine." *Lake Mich. Fed'n*, 742 F. Supp. at 445. As Judge Aspen explained in upholding an environmental group's public trust claim to enjoin a proposed 20-acre lakefill by Loyola University: "The very purpose of the public trust doctrine is to police the legislature's disposition of public lands. If courts were to rubber stamp legislative decisions, as Loyola advocates, the doctrine would have no teeth. The legislature would have unfettered discretion to breach the public trust as long as it was able to articulate some gain to the public." *Id.* at 446.

Illinois Central Railroad Company v. Illinois*, 146 U.S. 387 (1892), is the lodestar of modern public trust law. The Illinois Legislature conveyed a corridor of submerged land along Lake Michigan to Illinois Central to build new railroad tracks, warehouses and docks. The Supreme Court ruled that the State held the submerged land in trust for the public, and it could not lawfully be conveyed to the newly-chartered Illinois Central, even if the railroad facilities would, in part, benefit the public. The Court concluded it was "hardly conceivable that the legislature could divest the state of control" of public trust property. *Id.* at 454.

Since that time, federal courts have applied the public trust doctrine to: (1) nullify the Illinois General Assembly's grant of submerged Lake Michigan lakebed to U.S. Steel for a new steel plant, *People ex rel. Scott v. Chicago Park Dist.*, 66 Ill.2d 65 (1976); (2) enjoin the conveyance of lakebed to Loyola University for new athletic facilities and new public walking paths and lawn areas, *Lake Mich. Fed'n*, 742 F. Supp. 441 (N.D. Ill. 1990); and (3) stop the lease

of lakebed property for the proposed "George Lucas museum" along the Lake Michigan lakefront. *Friends of the Parks v. Chicago Park Dist.*,160 F.Supp.3d 1060 (N.D. Ill. 2016).[6]

That the Chicago Park District retains ownership of the CDF site and has not completely deeded the property away does not make any substantive difference. The issue for public trust purposes going back to *Illinois Central* has been *control*, not ownership. *Friends of the Parks*, 160 F. Supp. 3d at 1067. Interpreting the 1982 Illinois legislation to allow state or local agencies to "surrender control" of the CDF site to the Corps indefinitely for a *new* DMDF, further delaying the promised lakefront public park, would run afoul of public trust principles. *Id.*

Just because the Corps is a public, not a private, entity does not obviate public trust doctrine concerns. As the court explains in *Lake Michigan Federation*: "courts should be critical of attempts by the state to surrender valuable public resources to a private entity," and "the public trust is violated when the primary purpose of a legislative grant is to benefit a private interest" like the commercial barges here. 742 F. Supp. at 445-46 (citations omitted). "Any attempt by the state to relinquish its power over a public resource should be invalidated under the doctrine" especially when relinquishing "the power to control public access to the property." *Id.*

Regardless of the Corps' federal obligation to maintain navigation for commercial barges, that duty does not properly extend to dumping toxic wastes on the Chicago lakefront at this particular spot. It is not essential to build a new towering hill of toxic dredged wastes on the lakebed. That is not the only possible option and site in the whole region. *See* Parts III.D and

---

[6] Even when courts have denied public trust claims, *e.g. Friends of the Parks v. Park Dist.*, 203 Ill.2d 312 (2003), and *Protect Our Parks v. Buttigieg*, 2022 WL 910641 (N.D. Ill. Mar. 29, 2022), they recognize the vitality of the public trust doctrine as a check on legislative authority requiring more exacting review and less legislative deference is owed when the dispute involves submerged lakebed. *Id.* at *4.

IV.A, *infra*. For the people of Illinois, there is no material difference between a toxic waste dump on public trust land, whether it is operated by the Corps or a private party.

Barge shipping is a private, commercial activity. While disposal of toxic dredged waste material may facilitate navigation and commercial shipping, that is not a complete "get out of jail free card" from the public trust doctrine. As Judge Darrah explained in *Friends of Parks*: "There is a balance between preservation of public-trust lands and encroaching upon those lands for the public good. 160 F.3d at 1069 n.4; citing *Paepcke v. Pub. Bldg. Comm'n of Chicago*, 263 N.E.2d 11, 21 (1970). Courts must be skeptical with claims of public benefit, however, otherwise "[t]he legislature would have unfettered discretion to breach the public trust as long as it was able to articulate some gain to the public." *Lake Mich. Fed'n*, 742 F. Supp. at 446.

Courts have long recognized that economic benefits alone are not enough to justify avoiding the public trust doctrine. In *People ex rel. Scott*, the Illinois Supreme Court held that "[t]he claimed benefit here to the public through additional employment and economic improvement is too indirect, intangible and elusive to satisfy the requirement of a public purpose. In almost every instance where submerged land would be reclaimed there would be employment provided and some economic benefit to the State." 66 Ill.2d at 80. The Illinois General Assembly has not enacted legislation providing the Corps with land use rights needed for the DMDF. Misinterpreting and overextending the 1982 legislation to do so would run afoul of the public trust doctrine. The Court should grant Plaintiffs' motion for summary judgment and enjoin the Corps from building a DMDF on its proposed site. *Lake Mich. Fed'n*, 742 F. Supp. at 444, 447.

## III. THE CORPS' ENVIRONMENTAL IMPACT STATEMENT DOES NOT COMPLY WITH SEVERAL NEPA LEGAL REQUIREMENTS

The National Environmental Policy Act ("NEPA") is our nation's foundational environmental law through which Congress established a "broad national commitment to

protecting and promoting the environment." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989). NEPA requires agencies to include in "every report on . . . major Federal actions significantly affecting the quality of the human environment, a detailed" description of the proposed action's environmental impact. 42 U.S.C. § 4332 (2019). The environmental impact statement ("EIS") must thoroughly analyze the project's "reasonably foreseeable environmental effects," adverse impacts, and a "reasonable range of alternatives to the proposed action." *Id*. The EIS "has two purposes. It forces the agency to take a 'hard look' at the environmental consequences of its actions, including alternatives to its proposed course. It also ensures that these environmental consequences, and the agency's consideration of them, are disclosed to the public." *Sierra Club v. Fed. Energy Reg. Comm'n ("FERC")*, 867 F.3d 1357, 1367 (D.C. Cir. 2017). Since NEPA's enactment, the Council on Environmental Quality ("CEQ") has issued regulations governing all environmental reviews, 40 C.F.R. § 1502, and guidances to which courts must offer "substantial deference." *Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979).

The Corps' DMMP/EIS here violates several NEPA requirements. ***First,*** the DMMP/EIS does not meet the NEPA requirements for analyzing the change impacts of high lake levels and more severe storm surges battering its proposed 25-foot-high toxic waste dump. 40 C.F.R §§ 1502.16, 1508.8 (2019); *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 70-71 (D.D.C. 2019); *Sierra Club v. FERC*, 867 F.3d at 1371-72. ***Second,*** the DMMP/EIS fails to fully and fairly analyze the "cumulative impacts" of the DMDF in combination with multiple other "past, present and reasonably foreseeable" polluting projects and toxic pollution on the Southeast Side. 40 C.F.R. §§ 1508.7 (2019); *E.g., Habitat Educ. Ctr. v. Bosworth*, 363 F. Supp. 2d 1070, 1076-82 (E.D. Wis. 2005). ***Third,*** the cumulative impacts error is even more salient for this environmental justice community, 42 U.S.C. § 4332 (2019). ***Fourth***, the DMMP/EIS's unduly

18

narrow "purpose and need" statement constrains the required rigorous exploration and objective evaluation of all reasonable alternatives for the project. 42 U.S.C. § 4332 (2019); 40 C.F.R. § 1502.14 (2019); *Simmons*, 120 F.3d at 666. The DMMP/EIS essentially dismisses any alternatives other than a new toxic waste dump in the 10th Ward. AR 034152. ***Fifth,*** the DMMP/EIS analysis is impermissibly skewed. 40 C.F.R. § 1502.13 (2019); *Sierra Club v. U.S. Dep't of Transp.*, 962 F. Supp. 1037, 1043-44 (N.D. Ill. 1997).

Courts in the Seventh Circuit have reversed when agencies failed to comply with NEPA's requirements. *Simmons*, 120 F.3d at 666; *Openlands v. U.S. Dep't of Transp.*, 124 F. Supp. 3d 796, 807-11 (N.D. Ill. 2015); *Sierra Club*, 962 F. Supp. at 1042; *Habitat Educ. Ctr.*, 363 F. Supp. 2d at 1070, 1090. The Corps cannot proceed with its proposed DMDF unless and until a lawful EIS is completed. 5 U.S.C. § 706(2)(A); 40 C.F.R. § 1506.1(a) (2019).

### A. The EIS Fails to Analyze the Climate Change Impacts of Rising Lakewater Levels and Storm Surge Waves on the Proposed New Toxic Waste Dump

Problem # 1 is that the Corps failed to fully and fairly analyze the climate change impacts of rising lakewater levels and storm surges on its chosen lakeshore site for the DMDF. *Sierra Club v. FERC*, 867 F.3d at 1371-72; *WildEarth Guardians*, 368 F. Supp. 3d at 71; *AquAlliance v. Bureau of Reclamation*, 287 F. Supp. 3d 969, 1028 (E.D. Cal. 2018). NEPA requires that an EIS analyze the reasonably foreseeable direct and indirect environmental effects surrounding a project. 42 U.S.C. § 4332 (2019); 40 C.F.R §§ 1502.16, 1508.8 (2019). CEQ emphasizes that EISs must address the climate impacts of a proposed project and account for likely future climate-based effects *on* a project. CEQ, *NEPA Guidance on Consideration of Greenhouse Gas Emissions and Climate Change*, 88 Fed. Reg. 1196, 1207-10 (Jan. 9, 2023); CEQ, *NEPA Implementing Regulations Revisions Phase 2*, 88 Fed. Reg. 49924, 49967 (July 31, 2023). When information is "essential" to make a "reasoned choice among alternatives," NEPA requires that

19

the information be "rigorously explore[d] and objectively evaluate[d]." *Simmons*, *supra*; *Sierra*

*Club*, 962 F. Supp. at 1042; 40 C.F.R. § 1502.14 (2019). An EIS failing to analyze "an important

aspect" of climate's impact on the project, without explaining why providing data was infeasible,

violates NEPA. 40 C.F.R. § 1502.22 (2019, now codified at 40 C.F.R. §1502.21(c)); *Vecinos*

*para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1329 (D.C. Cir. 2021).

The DMMP/EIS's failure to consider the impact of climate-driven rising lake levels and

storm surges on the DMDF clearly violates that requirement. That climate change is contributing

to sea-level rise globally is backed by scientific consensus. AR 034217. That climate change is

causing Lake Michigan's water levels to be more extreme, causing more destructive storm-

surges, flooding, and coastline erosion is similarly observable and scientifically determined. *Id.*,

AR 034256. The DMMP/EIS does not dispute the local climate impacts at play. AR 034217, AR

034275. Despite this, the Corps' DMMP/EIS does not rigorously explore and objectively

evaluate how these same climate factors impact the environmental risks of siting its new toxic

dredged waste dump directly on the Lake Michigan shoreline compared to alternative upland and

inland sites. AR 034275; *Sierra Club*, 962 F. Supp. at 1042.

It does not analyze this at all. The EIS's lake level risk analysis instead focuses entirely

on navigation and dredging schedules. AR 034275. No mention is made of the structural

integrity of a shoreline dump site, risks of toxic pollution leaks, or higher maintenance costs

from surging waves. *Id.* 40 C.F.R. § 1502.22 (2019); *Vecinos*, 6 F.4th at 1329. This tunnel-vision

is not an "objective or rigorous analysis" of climate risks. AR 034217, AR 034275.

These deficiencies were raised with the Corps by its own expert consultant, but then

ignored. The Corps engaged Battelle Memorial Institute to provide independent peer review.

Battelle concluded the DMMP/EIS "does not assess risks and impact from climate change on the

20

future project." They recommended that the Corps "assess and estimate possible effects on the

[DMDF project] from climate change, *including the effects of lake levels, waves, and increases*

*in rainfall events and their intensity upon the [facility] or new berm walls*." AR 032584

(emphasis added). The Corps did not do so. AR 034275. Plaintiffs' comments raised this same

concern. AR 032538. The DMMP/EIS' failure to fully consider climate risks violates NEPA and

the APA. *Vecinos*, 6 F.4th at 1329 (finding EIS deficient where it failed to respond to

"significant opposing viewpoints concerning the adequacy" of its climate analysis.); *Sierra Club*

*v. FERC*, 867 F.3d at 1371-72; *WildEarth Guardians,* 368 F. Supp. 3d at 70-71.

### B. The DMMP/EIS Fails to Analyze the Adverse Cumulative Impacts of the DMDF in Combination with Other Polluting "Past, Present and Reasonably Foreseeable" Projects in the Southeast Chicago Area

Problem #2 is the Corps' failure to analyze adverse cumulative effects on the

environmental justice community in its project area. *Habitat Educ. Center,* 363 F. Supp 2d. at

1076. NEPA requires an EIS to assess "direct," "indirect" and "cumulative impacts," defined as:

> effects on the environment that result from the incremental effects of the action
> when added to the effects of other past, present, and reasonably foreseeable actions
> regardless of what agency (Federal or non-Federal) or person undertakes such other
> actions. Cumulative effects can result from individually minor but collectively
> significant actions taking place over a period of time.

40 C.F.R. § 1508.7 (2019). *See* CEQ*, NEPA Implementing Regulations Revisions,* 87 Fed.

Reg. 23453, 23462-23463 (April 20, 2022).

Agencies must take a "hard look" at the cumulative impacts. *Kleppe v. Sierra Club*, 427

U.S. 390, 410 n.21 (1976); *Sierra Club*, 962 F. Supp. at 1042. This "hard look" requires

comprehensive analysis; general or conclusory statements are not enough. *Habitat Educ. Center,*

363 F. Supp 2d. at 1099 ("General statements about 'possible' effects and 'some risk' do not

constitute a 'hard look' absent a justification regarding why more definitive information could

not be provided."); *Friends of the Earth v. U.S. Army Corps of Eng'rs*, 109 F. Supp. 2d 30, 42

(D.D.C. 2000) (finding agency's cumulative effect analysis was a vague and conclusory recitation of facts lacking "actual analysis"). In the three *Habitat Education Center* cases, the court concluded that the U.S. Forest Service's EISs for each of the separate logging projects violated the cumulative impacts requirement because they failed to analyze the combined impacts of all three projects on at-risk wildlife species. *Habitat Educ. Ctr. v. Bosworth*, 381 F. Supp. 2d 842; 363 F. Supp. 2d 1090; 363 F. Supp. 2d 1070 (E.D. Wis. 2005).

Here, the Corps failed to adequately analyze the adverse cumulative impacts of concentrating additional toxics on the site (AR 034182) even though it recognized the "long history of hazardous, toxic, or radioactive waste contamination" in the surrounding area.[7] AR 034226. The Corps did not provide a detailed analysis of the combination of the past toxic wastes dumped on the Southeast Side community. The DMMP/EIS also did not identify and assess other "present or reasonably foreseeable" projects in the area "regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7 (2019). For example, the controversial General Iron scrap metal shredding plant that proposed to move to the Southeast Side from Chicago's Lincoln Park neighborhood would add considerable pollution to the community.[8] The proposed Invert mining project would add more pollution across the street from George Washington High School. The Southeast Side continues to bear the combined pollution burden of projects that would not be accepted in leafier Chicago neighborhoods.

---

[7] The Southeast Side community meets the Corps' own current definition of "Economically Disadvantaged Communities," *Implementation Guidance for Section 160 of the Water Resources Development Act of 2020* (March 14, 2023), https://usace.contentdm.oclc.org/utils/getfile/collection/p16021coll5/id/36002

[8] Brett Chase, *Chicago encouraged General Iron's move to the Southeast Side,* Chicago Sun-Times (Jan. 9, 2023), https://chicago.suntimes.com/city-hall/2023/1/9/23547521/chicago-encouraged-general-irons-move-to-the-southeast-side-executive-says.

As a whole, the EIS ignores or summarily denies any meaningful cumulative adverse impacts – socio-economic, environmental, aesthetic or otherwise—on this community. AR 034284, AR 034289. The DMMP/EIS instead focuses only on perceived positives: how navigation and sediment capture benefit the local economy. AR 034285-AR 034286. But just because there are perceived benefits does not excuse the Corps from analyzing real costs. *See* AR 034304; 40 C.F.R §1502.16 (2019). The Corps' DMMP/EIS was required to analyze the cumulative impacts of all past, present and reasonably foreseeable polluting projects in the relevant area, and its failure to do so violates NEPA. 40 C.F.R. §§ 1508.25, 1508.7 (2019).

### C. The DMMP/EIS Fails to Adequately Analyze the Disproportionate and Cumulative Adverse Impacts of the DMDF on the Southeast Chicago Environmental Justice Community

Problem #3: The requirement of a "hard look" at cumulative effects applies to *all* EISs. When environmental justice communities are involved, the requirement to analyze cumulative and other impacts is even more salient. Addressing the disproportionate, often cumulative impacts occurring in environmental justice communities is a top federal priority. Beginning with Exec. Order No. 12898, *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations*, 59 Fed. Reg. 7629 (Feb. 16, 1994) through President Biden's Exec. Order No. 14096, *Revitalizing our Nation's Commitment to Environmental Justice for All*, 88 Fed. Reg. 25251 (April 21, 2023), the federal government recognizes that people living in neighborhoods with high concentrations of poverty and high percentages of people of color experience disproportionate pollution burdens and poor health outcomes that must be addressed, especially through environmental reviews. *Id.* at 25252. CEQ states: "the identification of a disproportionately high and adverse human health or environmental effect" in a community "should heighten agency attention to alternatives (including alternative sites),

23

mitigation strategies, monitoring needs, and preferences expressed by the affected community." CEQ, *Environmental Justice Guidance Under NEPA,* 10 (Dec. 10, 1997).

The Corps' failure to perform an adequate environmental justice analysis thus violates NEPA. *Vecinos*, 6 F. 4th at 1330. "The principle of environmental justice encourages agencies to consider whether the projects they sanction will have a "disproportionately high and adverse" impact on low-income and predominantly minority communities . . . . Executive Order 12,898 required federal agencies to include environmental-justice analysis in their NEPA reviews, and the [CEQ], the independent agency that implements NEPA, *see* 42 U.S.C. § 4344, has promulgated environmental-justice guidance for agencies." *Sierra Club v. FERC*, 867 at 1368.

The DMMP/EIS does not comply with these legal requirements even though the Corps recognizes the environmental justice communities in the project area, AR 034279-034284. The Corps attempts to minimize environmental justice concerns by stating that 97% of all anticipated dredging will occur in Calumet Harbor and River "making this area the most logical and efficient location for a facility to safely manage that material." AR 038231. That is the same circular logic that made Southeast Chicago an overburdened environmental justice community in the first place, and that Executive Orders 12898, 14008, 14096, and the CEQ's EJ Guidance are clearly designed to change. The DMMP/EIS is contradictory: loosely intimating that disposing the toxics elsewhere *will* implicate environmental justice concerns while maintaining that no such disproportionate adverse impacts are present or worth analyzing in the 10th Ward. AR 034260.

The DMMP/EIS concedes the new toxic waste dump will delay the promised lakefront park by at least 20 years, causing "legitimate concerns." AR 034304. The Corps argues, however, that because the park will be built "eventually," there is no "permanent negative impacts on socio-economic resources." AR 034304. An EIS must analyze present impact. 40

C.F.R. § 1508.7 (2019). It is illusory to claim no adverse impact today because it might go away sometime in the future *if* the Corps finally does end its toxic dumping after 20 more years. The DMMP/EIS also briefly leans on the excuse that the Corps isn't in charge of parkland conversion. CEQ regulations, however, make clear that agency ownership—"regardless of what agency (Federal or non-Federal). . . undertakes such other actions"—cannot justify limiting the analysis. 40 C.F.R. § 1508.7 (2019). The Corps violated NEPA's requirements, and Executive Orders governing projects in environmental justice communities. The DMMP/EIS is contrary to law, and arbitrary and capricious. *Vecinos,* 6 F.4th at 1330; *State Farm*, 463 U.S. at 43.

### D. The DMMP/EIS Fails to Comply with the NEPA Requirement that the Corps Rigorously Explore and Objectively Evaluate All Reasonable Alternatives, and Adopted an Improperly Narrow "Purpose and Need" Statement

An agency must conduct a "rigorous exploration and objective analysis of all reasonable alternatives." 40 C.F.R. § 1502.14 (2019). "When a federal agency prepares an [EIS], it must consider 'all reasonable alternatives' in depth. . . . No decision is more important than delimiting what these 'reasonable alternatives' are. That choice, and the ensuing analysis, forms 'the heart of the environmental impact statement.' 40 C.F.R. § 1502.14." *Simmons*,120 F.3d at 666. "[T]he first thing an agency must define is the project's purpose. The broader the purpose, the wider the range of alternatives; and vice versa. . . One obvious way for an agency to slip past the strictures of NEPA is to contrive a purpose so slender as to define competing 'reasonable alternatives' out of consideration (and even out of existence). The federal courts cannot condone an agency's frustration of Congressional will. If the agency constricts the definition of the project's purpose and thereby excludes what truly are reasonable alternatives, the EIS cannot fulfill its role. Nor can the agency satisfy the Act. 42 U.S.C. § 4332(2)(E)." *Id*.

CEQ expressly endorsed the *Simmons* approach as the best reading of NEPA. 87 Fed. Reg. 23453, 23459 (April 20, 2022). Problem #4 here is the Corps improperly constricted the

statement of purpose and need in its DMMP/EIS, leading it to consider an unduly constrained range of alternatives, all of which were only in Chicago's 10th Ward and Southeast Side.

The Seventh Circuit invalidated this tactic in *Simmons*, 120 F. 3d at 666-70, where the Corps sought to approve a new dam on free-flowing Sugar Creek in Southern Illinois to create a reservoir providing a new water supply for the City of Marion and a local water district. There were other alternatives, but the EIS's limited purpose and need statement imposed a "single source" requirement, which skewed the alternatives analysis to favor the dam and reservoir. The court reversed, concluding the EIS was defective because the Corps rigged the process to predetermine the outcome and avoid "examin[ing] the full range of reasonable alternatives." *Id.*

The Corps does here what *Simmons* prohibits. The DMMP/EIS notes that the purpose was to "identif[y] and evaluat[e] alternatives to manage the volume of dredged material expected to be generated by the operation and maintenance (O&M) of these federal navigation channels over a 20-year period of analysis." AR 034182. The purpose and need statement, however only "identifies and analyzes potential locations along the Calumet Harbor and River for the construction of a new sediment management facility, as well as the feasibility of expanding the existing Chicago Area CDF." *Id.* The result is that the *only* alternatives given serious consideration are "sediment management facilities" very much like the existing CDF and the proposed DMDF, and indeed only "sediment management facilities" in the 10th Ward, which is an environmental justice community. The array of alternatives dismissed without being "rigorously explored and objectively evaluated" include: (1) other upland landfill disposal sites outside of the 10th Ward; (2) the Corps' other available disposal facilities in the region with unused capacity; (3) source reduction, through land use management and green infrastructure, to reduce dredging; and (4) cleaning the dredged material of contaminants to open up a broader

26

range of disposal alternatives, including "beneficial use" options that Corps' policy favors. AR 034152. These alternatives were excluded after a summary "preliminary analysis." None received the detailed analysis required by NEPA. *Id.*

Here, as in *Simmons*: "[w]e are confronted . . . with an example of this defining-away of alternatives." *Simmons*, 120 F.3d at 666.This limitation of the purpose and need statement and consequently narrowed range of alternatives violates NEPA. "If NEPA mandates anything, it mandates this: a federal agency cannot ram through a project before first weighing the pros and cons of the alternatives. In this case, the [Corps] executed an end-run around NEPA's core requirement. By focusing on the single-source idea, the Corps never looked at an entire category of reasonable alternatives and thereby ruined its environmental impact statement." *Id.* at 670.

### E. The DMMP/EIS Improperly Skews Its Limited Alternatives Analysis to Favor the Lakefront Site on Top of the CDF

An alternatives analysis that relies on incorrect or implausible assumptions is deficient under NEPA. *State Farm*, 463 U.S. at 43 (agency action arbitrary where it offers an explanation "that runs counter to the evidence before the agency," or "fail[s] to consider an important aspect of the problem"); *Sierra Club*, 962 F. Supp. at 1043-44 ("implausible assumption" led to irrational alternatives comparisons); *Openlands*, 124 F. Supp. 3d at 807-10 ("flawed" assumption fatally undermined alternative analysis).

The Corps failed to rigorously explore reasonable alternatives other than 10th Ward sediment disposal dumps, and its limited alternatives analysis was skewed, not "rigorous" or "objective." ***First***, the DMMP/EIS skewed the analysis towards its preferred outcome by assigning *zero* negative cumulative effect to the loss of promised parkland and continuing a toxic dump site in an environmental justice community for at least another 20 years. AR 034304.

**Second**, the DMMP/EIS puts another thumb on the scale by assessing *no* negative "aesthetic" impact to siting the DMDF on the lakeshore. The EIS finds that the toxic dump will "enhance" aesthetic values because Southeast Side residents will supposedly be able to climb the capped dump in 20 years and admire the lake view from this lofty perch. AR 034286. Would Winnetka residents believe a new 25-foot-high toxic waste dump sited along their shoreline is a community asset providing aesthetic benefits when it is filled many years from now? AR 034286.

**Third**, the DMMP/EIS skews the comparison of alternatives by implausibly undervaluing the development opportunity cost of its preferred alternative compared to upland parcels, despite it being lakefront real-estate, planned for reuse as a park that would enhance neighborhood livability and property. Lakefront property is highly valued in Chicago and most places.[9] Currently, most of Chicago's lakeshore is publicly-enjoyed parkland and beaches, except for a significant part in this environmental justice community. *See* AR 011520-011521. Plans to help develop these "last miles" of park-less lakeshore are well-known and explained to the Corps in public comments. AR 032523. The Corps' DMMP/EIS nonetheless concludes, without substantive explanation, that "regardless" of the funding or plans, potential site use for public access or recreation is limited and negative impact on development opportunity is low. AR 034303-034304. The Corps impermissibly skewed its analysis with implausible assumptions thereby rendering the EIS contrary to law, and arbitrary and capricious. *State Farm*, 463 U.S. at 43; *Openlands,* 124 F. Supp. 3d at 807; *Sierra Club*, 962 F. Supp. at 1043-44.

---

[9] In a 2013 presentation, the Corps stated that "management site alternatives" "should not be [near] existing natural or cultural resources." AR 019110. The proposed DMDF would be sited adjacent to historic Calumet Park and Lake Michigan. AR 034222.

## IV.    THE CORPS' DECISION APPROVING THE NEW TOXIC DUMP VIOLATES THE CLEAN WATER ACT

The DMMP/EIS does not comply with Section 404(b)(1) Guidelines because the Corps has not demonstrated it selected the least environmentally damaging practicable alternative, 40 C.F.R. § 230.10(a), or that the DMDF is in "the public interest." 33 C.F.R. § 320.4.

### A.    The Corps Did Not and Could Not Determine that Building the DMDF on Top of the Current Disposal Site is the Least Environmentally Damaging Practicable Alternative for Managing Dredged Waste Materials

Section 404 of the Clean Water Act, 33 U.S.C. § 1344, and the U.S. EPA's "404(b)(1) Guidelines" govern discharges of dredge and fill pollutants by the Corps or anyone else. The Section 404(b)(1) Guidelines state: "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem." 40 C.F.R. § 230.10(a). This is generally called the Least Environmentally Damaging Practicable Alternative ("LEDPA") requirement. The 404(b)(1) Guidelines require the Corps to conduct a rigorous alternatives analysis to satisfy LEDPA. *Id.*

This Alternatives Analysis is substantive, and the Corps can *only* authorize the LEDPA. The selected alternative: (1) must be practicable, and (2) there must not be another practicable alternative that would have less adverse impact on the aquatic environment. An alternative is "practicable" if it is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). *See also* 33 C.F.R. Part 335. There are at least four available alternatives, or combinations of alternatives, that better meet the LEDPA standard than the proposed new toxic dredged waste dump on the Southeast Side shoreline site. *See* Part III.D, above. The Corps disqualified these practicable alternatives early in the process and focused narrowly on the cost and convenience of dumping its toxic dredged materials only in 10th Ward sites, and then picked the CDF site

apparently because it was the easiest. AR 034244-034248. The Corps did not fully and fairly consider the relative environmental impacts of other alternatives. *Simmons*, 120 F.3d at 669-670.

The 404(b)(1) Guidelines require consideration of, and, if practicable, selection of "activities which do not involve a discharge" and "[d]ischarges . . . at other locations" not waters of the United States. 40 C.F.R. § 230.10(a)(1). The Corps may not disregard areas "not presently owned" if alternatives "could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity." *Id.* § 230.10(a)(2). Permits have been denied under the 404(b)(1) Guidelines if practicable off-site alternatives have been available or have not been considered adequately. *E.g. Bersani v. U.S. EPA*, 850 F.2d 36, 41-43 (2d Cir. 1988) (affirming EPA's permit veto because upland site available); *Shoreline Assocs. v. Marsh*, 555 F. Supp. 169, 179 (D. Md. 1983) (affirming permit denial because upland site available).

The "practicability" of alternatives is evaluated by considering cost, logistics, and technology "in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). To be "practicable," an alternative need not maximize performance on a proponent's goals; it must simply satisfy the applicant's "basic purpose." *Id.*; *see Utahns for Better Transp. v. Dept. of Transp.*, 305 F.3d 1152, 1186 (10th Cir. 2002) (Corps should not consider "whether a proposed project is 'better' than an alternative with less wetlands impact" based on its cost or impact on development); *Sylvester v. U.S. Army Corps of Eng'rs*, 882 F.2d 407, 409 (9th Cir. 1989) (alternatives need not accommodate project components that are "merely incidental to the applicant's basic purpose"); *La. Wildlife Fed'n v. York*, 761 F.2d 1044, 1047-48 (5th Cir. 1985) (Corps properly chose an alternative that "reduced both the applicants' profit and . . . economic efficiency . . . in order to preserve other environmental values"); *Shoreline Assocs.*, 555 F. Supp. at 179.

The DMMP/EIS contains a discussion of the 404(b)(1) Guidelines in Appendix J, AR 038217, but it is limited to the proposed loading dock, and does not cover the entire project. The Corps appears to otherwise deny the applicability of the 404(b)(1) Guidelines. Doc. 15 at 22-23. Back in 1982, however, the Corps itself administratively determined that return water from even an *upland* confined disposal facility would be treated as "discharge of dredged or fill material" under Section 404 and 33 C.F.R. § 323.2(d)(1)(i) and therefore would require a Corps permit, specifically Nationwide Permit 16.[10] Activity that falls within the scope of Section 404 falls within the scope of the 404(b)(1) Guidelines, including the LEDPA and public interest requirements. Notably, despite not conducting a full analysis under 404(b)(1) for the DMDF, the Corps *did* perform this required 404(b)(1) analysis for its original CDF. AR 003753. The Corps thus violated the 404(b)(1) Guidelines with regard to the LEDPA requirement.

### B. Construction and Operation of the DMDF Will Have Disproportionate Adverse Impact on An Environmental Justice Community and Is Therefore "Contrary to the Public Interest"

Even if a proposed project *is* the least environmentally damaging practicable alternative—which the DMDF is not—it still may not be built if it is contrary to the "public interest." 33 C.F.R. §320.4; *Schmidt v. U.S. Army Corps of Eng'rs,* 2009 WL 579412 (W.D. Mich. 2009). "Public interest review" is defined in 33 C.F.R. § 320.4(a)(1) to require:

> The decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest. Evaluation of the probable impact which the proposed activity may have on the public interest requires a careful weighing of all those factors which become relevant in each particular case. The benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments.

---

[10] Corps Chicago District, *Nationwide Permit Summary* (2021), https://bit.ly/47V2g2c
*See also* 47 Fed. Reg. 31794, 31799 (July 22, 1982) (reason for new Nationwide Permit 16 was to avoid having to make distinctions between hydraulic and non-hydraulic discharges).

The factors to be considered, "including cumulative impacts" thereof, are: "conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people." *Id.; see Fox Bay Partners v. U.S. Army Corps of Eng'rs*, 831 F. Supp. 605 (N.D. Ill. 1993) (upholding denial of permit for marina on "public interest" grounds). This regulation must be interpreted literally for the public interest review, and the Corps must evaluate *all* listed factors. *United States v. Alaska*, 503 U.S. 569, 580-583 (1992).

The "public interest review" cannot be complete without evaluating environmental justice impacts. *EPA Legal Tools to Advance Environmental Justice* 83 (2022). https://bit.ly/3t4a4zO The Corps also commits to incorporate environmental justice into its work:

> For the U.S. Army Corps of Engineers, environmental justice and disproportionate impacts to Justice40 communities are considered throughout the agency's Civil Works programs and in all phases of project planning and decision-making. Environmental justice is achieved when everyone enjoys the same degree of protections and access to Civil Works programs and services to achieve a healthy environment in which to live, learn, and work.

Corps HQ, *Environmental Justice,* https://www.usace.army.mil/Missions/Environmental-Justice/ Unless the need is overwhelming, a project that continues or exacerbates cumulative adverse impacts in designated environmental justice communities is "contrary to the public interest."

The Southeast Side community around the CDF has long been overburdened by toxic wastes and pollution of all kinds. Residents living within a one-mile radius of the CDF exceed the 80th percentile for EPA's EJScreen indexes measuring ozone, diesel particulate matter, air toxics cancer risk, air toxics respiratory hazards, traffic proximity, and proximity to Superfund

sites. AR 034279-034284. Saddling this community with another 20 years (or more) of disposal of toxic dredged material does not meet the "public interest" test.

Making environmental justice a central component of the "public interest" test is not just a nice idea. It is a legal requirement for all federal agencies including the Corps. *First,* the Corps' proposed new DMDF site is contrary to Executive Orders 14008 and 14096. *Second,* this proposed site is contrary to the Corps' own environmental justice policy and the Justice40 Initiative established in the 2022 Interim Guidance. *Third,* the Corps' public interest review is also subject to ¶ 3.E of the Principles and Requirements for Federal Investments in Water Resources (March 2013), which require federal agencies to "ensure that Federal actions identify any disproportionately high and adverse public safety, human health, or environmental burdens of projects on minority, Tribal, and low-income populations" and "seek solutions that would eliminate or avoid disproportionate adverse effects on these communities."

The Corps' DMMP/EIS did not even acknowledge the 2013 Principles when it conducted its "public interest" review. Doc. 15 at 32. Therefore, the Corps' approval of the DMDF project on the Southeast Side lakebed site did not properly weigh environmental justice, neglecting current federal policy and explicit Corps guidance, and exacerbating toxics in an overburdened community. The Corps violated binding 404(b)(1) Guidelines, did not demonstrably select the LEDPA, and did not meet the public interest standard. Accordingly, it was contrary to law, arbitrary and capricious under 5 U.S.C. § 706, and must be set aside and reversed.

## V.  PLAINTIFFS HAVE STANDING

To establish Article III standing, Plaintiffs must demonstrate: (1) an injury in-fact; (2) that is fairly traceable to the challenged conduct; and (3) seek a remedy that is likely to prevent or redress the injury. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). An organization has standing to sue on behalf of its members when "(a) its members would

otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington St. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Both Plaintiff organizations have standing because their members have standing, this controversy is clearly germane to their missions, and the claim asserted and relief requested will apply across the board for their members.

Plaintiff Alliance of the Southeast is a community organization based in the 10th Ward of Chicago. PApp. 88. The Alliance's neighborhood group and resident members "have a special interest in Calumet Park and the adjacent Confined Disposal Facility" located in their community." *Id.* The Alliance's members "live, do business, and own property close to Calumet Park" and "are concerned about the effect of pollution from the CDF on their health and the health of their children." *Id.* The Alliance filed written comments on the draft and final EIS, and commented on the Corps' water quality permit application to the Illinois EPA. *Id.* Plaintiff Friends of the Parks "advocate for the creation of public parks along the Lake Michigan waterfront." PApp. 103. Friends of the Parks and its members have likewise been engaged in the decision-making process from the outset, filing comments on the draft and Final EIS. *Id.*

Plaintiffs' members will suffer imminent irreparable injury caused by the DMDF on top of the CDF. The declarations from twelve members included in the Appendix demonstrate their reasonable concerns about pollution from the existing CDF, and reasonable fears of future toxic exposure from the proposed DMDF. PApp. 87, 90-92, 94-95, 98, 100-101, 111, 116-117, 120. Several members own nearby property, and are concerned that their property values will diminish if the new toxic dredged waste dump is built. PApp. 97, 100. Plaintiffs' members want to see the long-delayed park built soon on the restored CDF as promised. PApp. 86-125.

34

Plaintiffs' members visit the adjoining Calumet Park for recreation. *See* PApp. 94, 97, 100, 107, 111, 117, 119-120, 122-123. Some members experience diminished aesthetic value because the CDF's "skull and bones" warning signs adjoin Calumet Park. PApp. 94-95, 108, 111, 119. This use and diminished enjoyment constitute an injury sufficient for standing. *Indiana Forest Alliance. v. U.S. Forest Serv.*, 325 F.3d 851, 855 n. 4 (7th Cir. 2003). "Environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational value of the area will be lessened' by the challenged activity." *Friends of the Earth v. Laidlaw Env't Servs.*, 528 U.S. 167, 183 (2000).

Plaintiffs' members benefit from the CDF closure because they would have more continuous lakefront access and enjoyment. PApp. 99, 108-110, 114. Plaintiffs' members enjoy bird watching in Calumet Park and their experience would be enhanced. PApp. 114-117; *see Lujan v. Defenders of Wildlife,* 504 U.S. 555, 562-563 (1992). These same members would visit the park more often when the CDF is closed and restored without the Corps' proposed new 25-foot-high toxic dredged waste dump on top. Plaintiffs also suffered and continue to suffer their own procedural injury because of the Defendants' NEPA violations. Courts recognize that "the failure to comply with NEPA's requirements causes harm itself." *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1037 (8th Cir. 2016).

The Corps' new proposed DMDF will cause injuries-in-fact both to the Plaintiffs' organizations and to their members, and granting summary judgment will provide meaningful relief. Plaintiffs have met all Article III standing requirements.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant Plaintiffs' motion for summary judgment, vacate and remand the Defendant's Record of Decision, and enjoin construction of the proposed new DMDF at the lakefront site.

Respectfully submitted,

HOWARD A. LEARNER
DANIEL ABRAMS
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1600
Chicago, IL 60601
(312) 673-6500
hlearner@elpc.org
dabrams@elpc.org

*Attorneys on behalf of Plaintiffs*
*Alliance of the Southeast and Friends of the Parks*

36