## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ALLIANCE OF THE SOUTHEAST     )
and FRIENDS OF THE PARKS,     )
    )
    Plaintiffs,     )
    )    Civil Action No. 23-1524
    v.     )    Honorable Thomas M. Durkin
    )
UNITED STATES ARMY CORPS OF     )
ENGINEERS et al.,     )
    )
    Defendants.     )

---

## PLAINTIFFS' COMBINED MEMORANDUM IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
## REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

HOWARD A. LEARNER
DANIEL ABRAMS
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1600
Chicago, IL 60601
(312) 673-6500
hlearner@elpc.org
dabrams@elpc.org

Attorneys on behalf of
Plaintiffs Alliance of the Southeast
and Friends of the Parks

Dated: April 9, 2024

# Table of Contents

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................... 1

STANDARD OF REVIEW ..................................................................................................... 6

ARGUMENT ........................................................................................................................ 6

I.   DEFENDANT CORPS DOES NOT HAVE THE REQUIRED LAND RIGHTS FROM THE STATE OF ILLINOIS TO BUILD ITS PROPOSED NEW TOXIC DREDGED WASTE DUMP ON LAKE MICHIGAN LAKEBED HELD IN THE PUBLIC TRUST .................... 6

     A.   The Defendants' Theories to Avoid the Time Limitations and Conditions in the Illinois Legislature's 1982 Statute Lack Legal Merit.................................................................. 7

     B.   Defendants' Public Trust Arguments Simply Miss The Point.......................................... 9

II.  THE CORPS' ENVIRONMENTAL IMPACT STATEMENT DOES NOT COMPLY WITH NEPA'S LEGAL REQUIREMENTS IN MULTIPLE WAYS............................................... 11

     A.   The Corps' EIS Did Not Analyze the Impacts of Climate Change on the Proposed New Towering Toxic Dredged Waste Dump's Structural Integrity ...................................... 12

     B.   Defendants' Cumulative Impacts Analysis Ignores Known, Foreseeable Projects....... 14

     C.   The Corps' Environmental Justice Analysis Is Plainly Inadequate ............................... 14

     D.   The Corps' Alternatives Analysis Was Effectively Limited To The 10th Ward............ 16

     E.   The Corps' Four-Year Old EIS Is "Stale," Outdated and Must Be Supplemented ....... 16

III. THE CORPS' NEW TOXIC DUMP IS NOT EXEMPT FROM PROJECT-SPECIFIC REVIEW OF WHETHER IT IS THE LEAST ENVIRONMENTALLY DAMAGING PRACTICABLE ALTERNATIVE AND IN THE PUBLIC INTEREST............................................. 17

IV. PLAINTIFFS CLEARLY HAVE STANDING ...................................................................... 20

CONCLUSION.................................................................................................................... 20

## TABLE OF AUTHORITIES

**Cases**

*Advocate Health Care Network v. Stapleton*, 581 U.S. 468 (2017)...................................................... 9

*Am. Bottom Conservancy v. Army Corps of Eng'rs*, 650 F.3d 652 (7th Cir. 2011) ...................... 20

*Bowes v. City of Chicago*, 120 N.E.2d 15 (1954) ............................................................................ 8

*Ctr. for Biological Diversity v. U.S. Forest Serv.*, 2023 WL 5310633 (D. Mont. Aug. 17, 2023)13

*Essex Cnty. Pres. Ass'n v. Campbell*, 536 F.2d 956 (1st Cir. 1981) ........................................ 5, 17

*Friends of the Clearwater v. Dombeck*, 222 F.3d 552 (9th Cir. 2000)........................................ 17

*Friends of the Earth v. Army Corps of Eng'rs*, 109 F. Supp. 2d 30 (D.D.C. 2000) ...................... 14

*Friends of the Earth v. Laidlaw Env't Serv.*, 528 U.S. 167 (2000).............................................. 20

*Friends of the Parks v. Chicago Park Dist.*, 160 F. Supp. 3d 1060 (N.D. Ill. 2016)............ 7, 8, 10

*Habitat Educ. Ctr. v. Bosworth*, 363 F. Supp. 2d 1090 (E.D. Wis 2005)...................................... 14

*Habitat Educ. Ctr. v. Bosworth*, 363 F. Supp. 2d 1070 (E.D. Wis. 2005)................................... 14

*Habitat Educ. Ctr. v. Bosworth*, 381 F. Supp. 2d 842 (E.D. Wis. 2005)..................................... 14

*Hoosier Env't Council v. Natural Prairie Indiana*, 564 F. Supp. 3d 683 (N.D. Ind. 2021) ........ 20

*Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437 (4th Cir. 1996) ................. 5, 17

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) ......................................................................................... 6

*Lake Mich. Fed'n. v. Army Corps of Eng'rs*, 742 F. Supp. 441 (N.D. Ill. 1990) ......................... 7

*League of Wilderness Defs. v. Connaughton*, 752 F.3d 755 (9th Cir. 2014)........................... 5, 17

*Openlands v. Dep't of Transp.*, 124 F. Supp. 3d 796 (N.D. Ill. 2015) .................................. 11, 16

*People ex rel. Scott v. Chicago Park Dist.*, 66 Ill.2d 65 (1976) ........................................... 2, 10

*Protect Our Parks, Inc. v. Chicago Park Dist.*, 971 F.3d 722 (7th Cir. 2020)............................ 20

*Sierra Club v. Dep't of Transp.*, 962 F. Supp. 1037 (N.D. Ill. 1997) ....................... 11, 13, 16, 20

*Simmons v. Army Corps of Eng'rs*, 120 F.3d 664 (7th Cir. 1997).................................... 2, 12, 16

*Standing Rock Sioux Tribe v. Army Corps of Eng'rs*, 255 F. Supp. 3d 101 (D.D.C. 2017)......... 15

*Van Abbema v. Fornell*, 807 F.2d 633 (7th Cir. 1986) ............................................................ 11, 13

*Vecinos para el Bienestar v. FERC*, 6 F.4th 1321 (D.C. Cir. 2021).................................... 13, 15

**Statutes**

33 U.S.C. § 1341 ............................................................................................................................. 19

33 U.S.C. § 1344(b) ...................................................................................................................... 3, 17

33 U.S.C. § 1344(e) ........................................................................................................................ 19

33 U.S.C. § 2326a .......................................................................................................................... 5, 6

42 U.S.C. § 4332 ............................................................................................................................. 16

84 Stat. 1818, 1823 (1970).............................................................................................................. 9

**Regulations**

23 C.F.R. § 771.129 .......................................................................................................................... 5

33 C.F.R. § 230.13 ........................................................................................................................ 4, 17

40 C.F.R. § 1501.3 ........................................................................................................................... 18

40 C.F.R. § 1502.1 ........................................................................................................................... 18

40 C.F.R. § 1502.14 ......................................................................................................................... 16

40 C.F.R. § 1502.9 ........................................................................................................................ 4, 17

CEQ, *Environmental Justice Guidance Under NEPA* (Dec. 10, 1997)....................................... 15

CEQ, *Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews*, 24 (Aug. 1, 2016) ............................................................................................ 13

CEQ, *National Environmental Policy Act Implementing Regulations Revisions*, 87 Fed. Reg. 23453 (April 20, 2022) ....................................................................................................... 2

*Corps of Engineers Agency Specific Procedures to Implement the Principles, Requirements, and Guidelines for Federal Investments in Water Resources*, 89 Fed. Reg. 12066 (Feb. 15, 2024) 18

**Executive Orders**

Exec. Order No. 12898, *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Pop's*, 59 Fed. Reg. 7629 (Feb. 16, 1994) ............................... 15

Exec. Order No. 14096, *Revitalizing Our Nation's Commitment to Environmental Justice for All*, 88 Fed. Reg. 25231 (April 23, 2023) ...................................................................................... 15

**Other Authorities**

A. Scalia & B. Garner, *Reading Law* (2012) ................................................................................ 9

Chicago Sun Times, "Judge to decide fate of relocated General Iron's Southeast Side operation by spring," (Jan. 30, 2023) ....................................................................................................... 12

WTTW, "'We Don't Want Your Trash': Residents Protest General Iron's Move to Southeast Side," (July 30, 2018) .............................................................................................................. 12

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Defendant U.S. Army Corps of Engineers ("Corps") has an obligation to maintain navigation and to dredge if necessary. That does not mean, however, that the Corps is somehow compelled or has the legal authority to insist on building a new 25-foot high towering toxic dredged waste dump on top of its existing confined disposal facility ("CDF") in Chicago's Southeast Side environmental justice community along the Lake Michigan shoreline where it will be battered by heavy waves and high winds from more intense storms driven by climate change. That both defies common sense and violates several statutes, regulations and Executive Orders. Pl. Br. at 2-4.[1] This lakefront site was long promised to become a public park after the CDF was filled and capped, and the site restored. Now is the time to keep that promise. That new lakefront park will be used and enjoyed by Plaintiffs, Southeast Side residents and many other Chicagoans.

The Corps overstates its navigation obligation, and skirts that dredging toxic-laden materials takes place *only once every two years*.[2] The Corps incorrectly argues that navigation requires disposing toxic dredged wastes on *this* particular lakefront site and *only* in the 10th Ward environmental justice community already overburdened with toxic contamination. Def. Br. at 9. The fact that dredging the Calumet River occurs only once every two years makes non-10th Ward disposal alternatives reasonable and feasible if the Corps had not skewed its economic and environmental analysis. Pl. Br. at 27-28.

Defendants' argument that "the core purpose of the public trust doctrine is to protect navigation" misstates the law. Def. Br. at 9. The public trust reaches beyond navigation to

---

[1] For ease of the court, the Plaintiffs refer to Plaintiffs' Opening Brief (Doc. 32) as "Pl. Br. at __", and to Defendants' Response and Opening Brief (Doc. 44-1) as "Def. Br. at __." Additionally cites to "PApp. __." refer to the appendix Plaintiffs filed with their Opening Brief, *see* Doc. 32-1.

[2] The Corps' EIS expects dredging "annually (on average) alternating between the Calumet Harbor and the Calumet River." AR 034154. The Corps, however, has identified Calumet Harbor dredged material as "suitable for certain unconfined upland beneficial uses," but Calumet River dredged material as not suitable for beneficial use. AR 034253.

"recreational uses, including bathing, swimming and other shore activities." *People ex rel. Scott v. Chicago Park Dist.*, 66 Ill.2d 65, 78 (1976). The public interest embodied in the public trust doctrine is not "inflexible," and it includes "a strong, though belated, interest in conserving natural resources and in protecting and improving our physical environment." *Id.* at 78-79. Illinois'1982 legislation states twin goals of "the improvement of certain harbor and park facilities." PApp. 2.

The Defendant Corps' "stuck in the sand" reliance on yesterday's build anything and everywhere approach to dealing with modern-day problems violates several laws and regulations:

(1) The Corps is not complying with federal authorizing legislation and the Illinois' public trust doctrine by proposing to build a *new* toxic dredged waste dump on public lakebed without any agency having obtained the required *new* statutory authorization from the Illinois Legislature. The Corps concedes that Illinois' 1982 statutory authorization and the 1982 Local Cooperation Agreement ended in 10 years or when the CDF became full. Def. Br. at 3.

(2) The Corps' 2020 environmental impact statement ("EIS") fails to comply with the National Environmental Policy Act ("NEPA") in light of the Seventh Circuit's controlling decision in *Simmons v. Army Corps of Eng'rs*, 120 F.3d 664 (7th Cir. 1997), and the Council on Environmental Quality's ("CEQ") NEPA regulations that specifically cite to *Simmons*: "[i]t is contrary to NEPA for agencies to 'contrive a purpose so slender as to define competing "reasonable alternatives" out of consideration (and even out of existence).'" CEQ, *National Environmental Policy Act Implementing Regulations Revisions*, 87 Fed. Reg. 23453, 23459 (April 20, 2022), *quoting Simmons*, 120 F.3d at 666. That is what the Corps did here by: failing to assess climate-driven adverse impacts on the toxic dump's structural integrity; skewing its EIS to avoid obvious, negative environmental and economic effects of a new 25-foot high toxic dredged waste dump in

an environmental justice community; and not rigorously exploring and objectively evaluating all reasonable alternatives; instead focusing only on sites in Chicago's 10th Ward.

(3) The Corps violated the Clean Water Act ("CWA") and its own implementing regulations by failing to fairly assess whether its proposed new toxic dredged waste dump is truly the "least environmentally damaging practicable alternative" or is in the "public interest." 33 U.S.C. § 1344(b)(1). It is not, especially in light of the Executive Orders and the Corps' own CWA regulations providing clear federal policy against adding more toxic contamination in environmental justice communities like the Southeast Side and 10th Ward. The Corps has obtained *none* of the three state water quality permits from the Illinois EPA required to build and operate a toxic waste dump on the lakefront site. This Court recognized the Corps' "permit problems" at the February 6, 2024 hearing, and directed the Corps to "make sure that there is no bulldozing, construction of a road or any other type of activity on that site without notice to the Court and plaintiffs." Doc. 43 at 4, 14. All three state permits have been denied, withdrawn or deferred.

Defendants' repeated invocation of "navigation" is not a "get out of jail free card" that excuses these legal violations. The Corps is building a *new* toxic dredged waste dump, not just disposing more wastes in its CDF. The Corps' EIS makes that clear (AR 034165, 034521), and that is why the Corps is seeking the state water quality permits from the Illinois EPA. The Corps cannot evade the legal necessity of new statutory authorization from the Illinois General Assembly for a *new* toxic dredged waste dump. It cannot rely on the 1982 statutory authorization for the old CDF that only permitted a time-limited use of public trust lakebed. Def. Br. at 14-15.

Whatever was then the reasonableness of the Corps' toxic waste dump siting decisions made more than 40 years ago in the early 1980's, the world has since changed. The governing laws and regulations have changed. Pl. Br. at 2-4. Public policies have changed for protecting Chicago's

iconic lakefront and public parks. Public policies have changed about the environmental *in*justices of disproportionately dumping more toxic pollution on communities like Chicago's Southeast Side with its low- and moderate-income, mostly Latino residents. Public policies and public concerns have changed about science-based climate change realities and, particularly, the real-world impacts on Lake Michigan and other Great Lakes shoreline areas. Pl. Br. at 2-4. The Chicago lakefront is for people and parks, not new toxic dump sites. AR 011513-11519.

The Corps argues that it can avoid complying with CEQ's new NEPA regulations and the new Executive Orders on Climate Change and on Environmental Justice that apply to all federal agencies, and with the Corps' own new CWA regulations issued after the 2020 EIS. Def. Br. at 33-35. That is incorrect both as a matter of law, and as a matter of sound policy and common sense.

**First**, of course, the Corps—as well as this Court—are bound by statutory changes and the U.S. Supreme Court's and Seventh Circuit's decisions post-2020. For example, the Defendants' argument for a "highly deferential" standard of judicial review will not hold water if the Supreme Court scales back such deference in the pending cases for which decisions are expected soon.

**Second**, the Corps' 2020 EIS is outdated, and must be "supplemented" as a matter of law. The Corps' regulations require that "[a] supplement to the draft or Final EIS should be prepared whenever required as discussed in 40 C.F.R. § 1502.09(c)." 33 C.F.R. § 230.13. That references CEQ's NEPA implementing regulations, which require that agencies "[s]hall prepare supplements to either draft or final environmental impact statements if a major Federal action remains to occur, and . . . [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(d) (formerly codified as 40 C.F.R. § 1502.9(c), and then changed to § 1502.9(d) in CEQ's updated regulations).

Here, the major federal action—building the new toxic dredged waste dump tower—has yet to occur. The new CEQ regulations, Executive Orders on climate change and environmental justice impacts, and the Corps' own CWA regulations are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." These present "a seriously different picture of the environmental impact of the proposed project from what was previously envisioned." *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 443 (4th Cir. 1996); *League of Wilderness Defs. v. Connaughton*, 752 F.3d 755, 761 (9th Cir. 2014); *Essex Cnty. Pres. Ass'n v. Campbell*, 536 F.2d 956, 961 (1st Cir. 1981).

**Third**, under NEPA, there are many examples of when agencies' EISs are treated as "stale." For example, the Federal Highway Administration has long viewed an EIS as stale after three years. 23 C.F.R. § 771.129. The Corps' final EIS is reaching the four-year old mark.

**Fourth**, as the Court is aware, the Corps has still failed to obtain *any* of the three required state water quality permits. Doc. 43 at 5. Therefore, it is appropriate and in the public interest to treat the Corps' almost four-year old EIS as outdated and requiring supplementation. The Illinois EPA denied the Corps' requested stormwater permit on April 25, 2023, and the Corps apparently has not resubmitted that permit request. PApp. 126; Exhibit 1, attached. Then, the Corps withdrew its Section 401 state water quality certification application in its January 24, 2024 letter after the Illinois EPA apparently informed the Corps that it would deny this permit. Doc. 39; Doc. 40, letter attached as Exhibit 2. The Corps has not obtained Illinois EPA's approval of a construction permit.

The Court should: (1) grant summary judgment in Plaintiffs' favor; (2) invalidate and set aside the Corps' actions as violating 33 U.S.C. § 2326a(c), NEPA and the CWA (3) at least require the Corps to supplement its EIS; and (4) enjoin the Corps from building its *ultra vires* proposed new toxic dredged waste dump unless and until it has complied with all legal requirements.

**STANDARD OF REVIEW**

Plaintiffs' opening brief correctly states the current state of the law governing judicial review for this case. Pl. Br. at 10-11. Courts owe little deference to agencies' interpretations of law, and, in particular, the Supreme Court has "cabined" deference to agencies' interpretations of their own regulations. *See gen. Kisor v. Wilkie*, 588 U.S. ___, 139 S. Ct. 2400, 2408 (2019). Defendant nonetheless argues for a "highly deferential" standard of review even for the issues of law presented here. Def. Br. at 8. That is contrary to current governing case law (Pl. Br. at 10-11), and this Court and all parties are aware that the Supreme Court has sent strong signals that it is likely to reduce *Chevron* and other judicial deference to administrative agency actions.

**ARGUMENT**

**I.    DEFENDANT CORPS DOES NOT HAVE THE REQUIRED LAND RIGHTS FROM THE STATE OF ILLINOIS TO BUILD ITS PROPOSED NEW TOXIC DREDGED WASTE DUMP ON LAKE MICHIGAN LAKEBED HELD IN THE PUBLIC TRUST**

Plaintiffs' opening brief explains why the Defendant Corps has not complied with applicable federal legislation (33 U.S.C. § 2326a(c)) to build its proposed new toxic dredged waste dump because, *first,* the Illinois General Assembly's 1982 legislation authorizing temporary use of the lakebed for the now-filled CDF was time-limited; and *second*, otherwise interpreting the 1982 Illinois legislation to somehow allow the Corps to build a towering *new* toxic dredged waste dump would violate the Illinois public trust doctrine. Pl. Br. at 12-17. Because the Illinois Legislature has not provided any post-1982 statutory authorization, the Corps lacks the required land rights to build its new dump on the lakefront site.

The Corps conflates its obligation to support navigation and engage in dredging, when necessary, with the separate issue of how and where to dispose toxic-laden materials dredged only once every two years from the Calumet River. The former obligation does not require the latter of disposing the toxic dredged wastes only at a site on Chicago's lakefront and only in the 10th Ward.

6

### A. The Defendants' Theories to Avoid the Time Limitations and Conditions in the Illinois Legislature's 1982 Statute Lack Legal Merit

Illinois' 1982 legislation states the goals of *both* "the improvement of certain harbor and park facilities." IL PA 82-770; PApp. 2. The Defendants' brief completely ignores the Illinois Legislature's clearly expressed commitment and intent in the 1982 statute to establish specific limiting conditions on allowing the CDF to be built on lakebed in the 10th Ward: when the CDF was full the site would then be restored and transformed into a public park for community residents' use and enjoyment. Pl. Br. at 13-14. The Corps cannot reasonably dispute that:

- Lake Michigan lakebed is held in public trust.

- Only the Illinois General Assembly can transfer property rights to lakebed for public uses subject to limitations of the public trust doctrine as interpreted by the courts. *Friends of the Parks v. Chicago Park Dist.*, 160 F. Supp. 3d 1060, 1065 (N.D. Ill. 2016); *Lake Mich. Fed'n. v. Army Corps of Eng'rs*, 742 F. Supp. 441, 444 (N.D. Ill. 1990).

- The Corps' permission to use the lakebed was limited to ten years or, at the latest, when the CDF was full. Def. Br. at 3.

- The Illinois General Assembly's 1982 statute was enacted with the express intent that when the CDF was full, then the site would be restored and become a public lakefront park for community residents and all Chicagoans to use and enjoy. Pl. Br. at 14.

- The Illinois General Assembly has *not* passed any subsequent legislation providing further rights to the Park District or the Corps to use this lakebed held in public trust.

The Corps' arguments cannot be reconciled with the Illinois General Assembly's plain language in the 1982 legislation and expressed intent. **First,** the Corps glosses over the 1982 statute's specific time limit, and the future community lakefront park condition. Pl. Br. at 14; AR 003872. "When filled to capacity the CDF will be capped, seeded, and turned over to the local sponsors [Chicago Park District]" for the long-promised park. AR 005508.

**Second,** the Corps makes a kind of estoppel argument—that even if the Park District could not lawfully grant them permission to use the lakebed for an indefinite period, it nevertheless did

purport to grant such permission, and the Corps is entitled to "reasonably rely" on that. Def. Br. at 14. There is, of course, no support for the proposition that a duly enacted statute can be amended by anyone except the Legislature. The Corps knows that it can only receive those land rights that a non-federal sponsor has the authority to give. A seller cannot offer more land rights than it owns. Plaintiffs cannot sell the Brooklyn Bridge, and the Park District cannot offer more land rights than it has authority under the 1982 Illinois statute to grant.

In *Friends of the Parks v. Chicago Park Dist.*, 160 F. Supp. 3d at 1065, the district court held that, absent clear and dispositive action by the Illinois General Assembly, *control* of lakebed could not be transferred without violating the public trust doctrine:

> whether the use of previously submerged Illinois land protected by the public-trust doctrine is permissible has been determined by the courts in light of the authorizing legislation by the Illinois General Assembly . . . . "A disposition of these submerged lands, by the State, is a question of the power of the State, acting as a governmental body." *Bowes v. City of Chicago*, 120 N.E.2d 15, 22–23 (1954).

Judge Darrah further explained: "It is an established rule that the General Assembly cannot delegate its general legislative power to determine what the law shall be." *Id*. (citation omitted). That is why, in 1982, the General Assembly provided an explicit time-limited grant to the Park District. It is up to the Illinois General Assembly to decide when and how to convey ownership or control over public trust lakebed, *not* the Chicago Park District. While the Corps purports to rely on the Park District's representations (Def. Br. at 11-15), the Corps is well aware that no new post-1982 Illinois legislation has been enacted. The Park District cannot provide public trust lakebed to the Corps that it is not empowered by Illinois statute to provide.

**Third,** the Corps argues that the 1982 Illinois statute's limiting language is unenforceable because it's not specific enough to create a "reversionary interest." Def. Br. at 12-14. That misses the point. This land does not revert to anyone. The General Assembly's authorization to the Park

District limits the property use rights that can be made available to the Corps: ten years or until the CDF is filled, noting the reference to Section 123 of Public Law 91-611, which allows disposal dumps to only hold ten years of dredged materials. 84 Stat. 1818, 1823 (1970). Pl. Br. at 13-14. Defendants so recognize elsewhere. Def. Br. at 3; AR 005508, AR 034294.

This 1982 Illinois statutory language is very specific. It is not a "general purpose" statement that courts occasionally refrain from enforcing. The 1982 statute authorizes the Park District to grant the Corps, at most, a revocable, time-limited allowance to use the lakebed for a particular purpose. The Park District cannot provide more than what the Illinois Legislature authorized. The Corps' statutory interpretation (Def. Br. at 12-14) essentially erases the Legislature's time and use limitations contrary to the "surplusage canon" (*verba cum effectu sunt accipienda*), requiring that all statutory provisions must be given effect. A. Scalia & B. Garner, *Reading Law*, sec. 26 at 174-79 (2012); *Advocate Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017).

**Fourth,** the Corps' claims that Plaintiffs' lawsuit is time barred by laches lacks merit. Def. Br. at 15. The CDF was authorized for ten years or until it finally became full. Pl. Br. at 14. Plaintiffs have timely challenged the Corps' subsequent plans to build a new vertical toxic dredged waste dump tower on the lakefront, instead of "capp[ing] seed[ing], and turn[ing the land] over to the local sponsors" to become the long-promised public park. AR 005508. Plaintiffs diligently raised their claims after the Corps impermissibly proposed to build a *new* toxic dredged waste dump on the Chicago lakefront site contrary to the 1982 Illinois legislation. Plaintiffs brought their lawsuit after the Corps issued its EIS. The Corps still has not obtained the Illinois EPA's approval of the three state water quality permits required to begin construction.

### B. Defendants' Public Trust Arguments Simply Miss The Point

The Corps argues that a government entity cannot violate the public trust doctrine because anything related to navigation satisfies any public trust obligation. Def. Br. at 9-11. That misses

the point. Illinois' 1982 statute must be interpreted to align with the state's public trust obligations. Pl. Br. at 14-17. The State owns Lake Michigan lakebed in trust forever for the public. The Illinois statute established a balanced approach: the Park District could allow the Corps to use lakebed for the CDF for a limited time, and then the property would become a public park. *Id.* The Corps' statutory interpretation would erase the time-limit, and violate Illinois' public trust doctrine.

The Corps provides no real basis for its argument that the Illinois General Assembly is free to grant unlimited lakebed use rights to the Corps for any purpose just because it is a government agency. Under Illinois' public trust doctrine, the question is not just public versus private identity of the party receiving rights to the lakebed, but whether the *purpose* of the use is private and commercial, or for the public's benefit. *Friends of the Parks*, 160 F. Supp. 3d at 1066-69.

The Corps' argument that "navigation" is immunized against public trust scrutiny goes way too far. What is at issue in this case is the Corps' proposed new toxic dredged waste dump tower being sited on the lakefront. The Corps can still achieve its dredging and navigation goals by taking a "harder look" at sites off the lakefront and outside the 10th Ward. Just saying "navigation" is not a "get out of jail free card" to avoid public trust law.

Under modern public trust law, public access and control weigh heavily. *Friends of the Parks*, 160 F. Supp. 3d at 1066-69. The public trust goes well beyond navigation to also include "recreational uses, including bathing, swimming and other shore activities." *People ex rel. Scott*, 66 Ill. 2d at 78-79. The public trust doctrine also includes "conserving natural resources and . . . protecting and improving our physical environment." *Id.* The 1982 statutory authorization granting lakebed use rights for the CDF has expired. Because the Legislature has not provided the Park District or the Corps with subsequent authorization, the Corps lacks necessary authority to build its new toxic dredged waste dump on this lakebed site on Chicago's Southeast Side.

## II.  THE CORPS' ENVIRONMENTAL IMPACT STATEMENT DOES NOT COMPLY WITH NEPA'S LEGAL REQUIREMENTS IN MULTIPLE WAYS

The problem to be solved here is how to dispose of toxic dredged wastes *only once every two years*. AR 034154. Dredging will occur once a year on average, alternating between Calumet Harbor and Calumet River. *Id.* Only the Calumet River produces toxic-laden material. *Id.* The Corps essentially provides just one solution: five "alternatives," all of which are dump sites in the 10th Ward, plus a no-action alternative. Def. Br. at 17, 28. The Corps screened out all other siting options—such as private landfills and other Corps CDFs outside the 10th Ward—and subjected the remaining 10th Ward-only alternatives to a skewed analysis that denies virtually all negative impacts to the community, even the most obvious, while broadly highlighting perceived benefits.

For example, the Corps says using private landfills (once every two years) is more costly (Def. Br. at 27), but that's because the Corps' fuzzy math assigns: (1) *zero* economic cost to the negative impacts of the community losing the long-promised lakefront park for another 20 years; (2) *zero* economic cost to the burdens and risks of the new toxic waste dump, especially if it leaks; (3) *zero* economic cost to negative aesthetic impacts of a new towering toxic waste dump on the Southeast Side lakefront—suffice it to say, Winnetka residents would not view a toxic waste dump hill on their shoreline as a community asset per the Corps' argument (AR 034286); and (4) *zero* economic cost to using valuable, prized lakefront property for a toxic waste dump instead of for people and parks. AR 034299; Doc. 15 at 41 (admits excluding lost opportunity costs). "As a guardian of the public welfare, [the Corps] must credibly attempt to appraise economic benefit" under NEPA. *Van Abbema v. Fornell*, 807 F.2d 633, 639 (7th Cir. 1986). These "implausible assumptions" and "flawed" forecasts fatally undermine the alternatives analysis. Pl. Br. at 27-28; *Van Abbema*, 807 F.2d at 639-42; *Openlands v. Dep't of Transp.*, 124 F. Supp. 3d 796, 807-10 (N.D. Ill. 2015); *Sierra Club v. Dep't of Transp.*, 962 F. Supp. 1037, 1043-44 (N.D. Ill. 1997).

The Corps also gets key facts wrong: for example, they argue the "proposed General Iron scrap metal shredding plant" in the 10th Ward "could not have been considered as a present or reasonably foreseeable project in the area for purposes of the 2020 EIS." Def. Br. at 21. This highly controversial issue was widely known and reported starting back in 2018.[3] "The proposed move of General Iron from its longtime home in Lincoln Park to the Southeast Side, first announced in 2018, created a public firestorm of protests by community groups and environmental groups."[4]

Ultimately, Defendants' brief describes an elaborate process that just points to the same place: the 10th Ward, an environmental justice community on Chicago's Southeast Side. The Corps skewed its analysis to reach a predetermined result with a single *place* solution—only in the 10th Ward—like the "single source" solution rejected by the 7th Circuit in *Simmons*, 120 F.3d at 667.

## A. The Corps' EIS Did Not Analyze the Impacts of Climate Change on the Proposed New Towering Toxic Dredged Waste Dump's Structural Integrity

The Corps' own independent consultants, Battelle Group, urged the agency to "[e]xplicitly assess and estimate possible effects on the [DMDF project] from climate change, including the effects of lake levels, waves, and increases in rainfall events and their intensity upon the [facility] or new berm walls." AR 032584. Instead of analyzing the impacts of climate-driven extreme weather events on the DMDF's structural integrity, the Corps instead focused its analysis of this impact on its dredging schedules. AR 034275-76; AR 038101. The Corps provides only a single conclusory sentence in a table buried in Appendix H, noting it may need to address the matter identified by Battelle. AR 038101. That is not "analysis," and the EIS's climate analysis sections contain no further discussion of this sentence. AR 034217, 275-76; AR 038094-116.

---

[3] WTTW, "'We Don't Want Your Trash': Residents Protest General Iron's Move to Southeast Side," (July 30, 2018).
[4] Chicago Sun Times, "Judge to decide fate of relocated General Iron's Southeast Side operation by spring," (Jan. 30, 2023),

There's little specific analysis of the actual problem identified by Battelle. AR 034131. The Corps' "action taken" was an unresponsive, generalized discussion of greenhouse gas emissions, instead of specific analysis of the problem identified. AR034131-32. *See Ctr. for Biological Diversity v. U.S. Forest Serv.*, 2023 WL 5310633 at *11 (D. Mont. Aug. 17, 2023) ("[A]lthough the USFS took steps to explain how the Project could impact carbon emissions, it did so only in general terms, which does not meet NEPA's 'hard look' standard."). The Corps ignored both specific public comments (AR 032538) and its own consultants on this structural integrity issue. That's not the required "hard look." Pl. Br. at 19-21; *Vecinos para el Bienestar v. FERC*, 6 F.4th 1321, 1329 (D.C. Cir. 2021); *Van Abbema*, 807 F.2d at 641-42; *Sierra Club*, 962 F. Supp. at 1042.

CEQ has long required agencies to thoroughly assess whether a project could be "considered vulnerable to the effects of climate change, such as increasing sea level, drought, high intensity precipitation events, increased fire risk, or ecological change."[5] CEQ's 2023 *Guidance on Consideration of Greenhouse Gas Emissions and Climate Change* requires that EISs "consider[] the reasonably foreseeable effects of climate change on infrastructure investments and the resources needed to protect such investments over their lifetime," in order to "ensure climate-resilient infrastructure and operations." 88 Fed. Reg. 1196-97. The Corps' brief (at p. 19) stitches together disparate bits and pieces in the EIS: a margin note on the facility map (AR037969), brief responses to public comments (AR034372), and a citation to a 1995 report (AR034214). That does not pass legal muster. The Corps' EIS violated NEPA by avoiding a hard look at climate change impacts on the DMDF's structural integrity, and not addressing the public commenters' and its own consultants' opposing viewpoints. *Vecinos*, *supra*; *Van Abbema*, *supra*; *Sierra Club*, *supra*.

---

[5] CEQ, *Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews*, 24 (Aug. 1, 2016).

**B. Defendants' Cumulative Impacts Analysis Ignores Known, Foreseeable Projects**

NEPA requires that the Corps conduct a robust cumulative impacts analysis assessing the impacts of other reasonably foreseeable projects in the area. Pl. Br. at 21-23; *Habitat Educ. Ctr. v. Bosworth*, 381 F. Supp. 2d 842; 363 F. Supp. 2d 1090; 363 F. Supp. 2d 1070 (E.D. Wis. 2005). The Corps missed the ball in its EIS and brief. Def. Br. at 19-22. For example, as explained above, the Defendant argues that "neither Invert mining nor General Iron were reasonably foreseeable in August 2020" (Def. Br. at 21, n.8), and there is "no evidence that these two projects were foreseeable in 2020 when the Corps finalized the EIS." *Id*. at 21. That argument is factually incorrect. The highly public controversy over the General Iron scrap metal shredding plant was widely known in 2018, and would have been apparent to the Corps if it took *any* look, let alone the required "hard look." A lawful cumulative impact analysis requires much more, and the Corps' approach violated NEPA. Pl. Br. at 21-23; *Habitat Educ. Ctr.*, 363 F. Supp 2d. at 1099 ("General statements about 'possible' effects and 'some risk' do not constitute a 'hard look.'"); *Friends of the Earth v. Army Corps of Eng'rs*, 109 F. Supp. 2d 30, 42 (D.D.C. 2000) (Corps' cumulative effect analysis was a vague and conclusory recitation of facts lacking "actual analysis").

**C. The Corps' Environmental Justice Analysis Is Plainly Inadequate**

While the federal government has been issuing new Executive Orders and NEPA regulations requiring agencies to more fully assess and avoid harmful impacts on environmental justice communities, such as Chicago's 10th Ward and Southeast Side (Pl. Br. at 2-3 and 23-25), the Corps relies on 1994 standards. AR 034279. The Corps essentially argues that there are benefits associated with putting the toxic dump in the 10th Ward, and that the CDF is already there, so the new 25-foot high toxic dredged waste dump won't create meaningful negative effects on the surrounding community. *See* AR 034304; AR 038240-41. Likewise, according to the Corps,

community residents have already waited 30 years for their promised park, so another 20 or more years of delay do not matter. *See* AR 034161; AR 034279; AR 034304; Def. Br. at 24.

The Corps also argues that its selected alternative will have no negative aesthetic, recreational or environmental justice impacts. Def. Br. at 22, 24; AR 034284; AR 034286; AR 034279; AR 034304. Let's get real. This is a 25-foot high toxic dump on the lakefront, next to popular Calumet Park, and in the 10th Ward, an already overburdened environmental justice community. AR 038235; AR 034222. The long-promised public park will be delayed for 20 more years. AR034161. The Corps' argument that the residents should view the toxic waste dump as an aesthetic *benefit* because it might become part of a hilly park in the distant future is absurd at best and offensive at worst. AR 034286; Pl. Br. at 28. That is arbitrary and capricious on its face.

The Corps' EIS skews its environmental justice analysis towards specious perceived benefits, and it understates the direct, indirect, and cumulative harms this project will cause. Pl. Br. at 21-25, 27-28. *Standing Rock Sioux Tribe v. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 140 (D.D.C. 2017) (rejecting Corps' environmental justice analysis for ignoring oil spill risks); *Vecinos*, 6 F.4th at 1330 (rejecting the same for ignoring part of the affected community). That flawed approach does not meet NEPA and Executive Order standards from 1994 and 1997.[6] Nor does it comply with CEQ standards and Executive Orders adopted in 2021 to 2024.[7] The Court should, at least, require the Corps to supplement its EIS as explained above.

---

[6] CEQ, *Environmental Justice Guidance Under NEPA* (Dec. 10, 1997); Exec. Order No. 12898, *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Pop's*, 59 Fed. Reg. 7629 (Feb. 16, 1994).
[7] *E.g.,* Exec. Order No. 14096, *Revitalizing Our Nation's Commitment to Environmental Justice for All*, 88 Fed. Reg. 25231 (April 23, 2023); *see* Pl. Br. at 2-3, 23-25 for additional citations.

### D. The Corps' Alternatives Analysis Was Effectively Limited To The 10th Ward

The Seventh Circuit explains in *Simmons* why an EIS must consider all reasonable alternatives: "No decision is more important than delimiting what these 'reasonable alternatives' are. That choice, and the ensuing analysis, forms 'the heart of the environmental impact statement.'" 120 F.3d at 666. "NEPA mandates a searching inquiry into alternatives, but says nothing about which to choose. It binds federal officials to justify their plans in public, after a full airing of alternatives. It thus blends a faith in technocratic expertise with a trust in democracy." *Id*.

The Corps' EIS does not live up to that required "searching inquiry." The Corps' brief describes an elaborate "preliminary analysis" and "screening." Def. Br. at 4-5, 26-28; AR 034152. That, however, quickly got to "a final array of alternatives . . . five confined disposal locations" all in the 10th Ward, and a no-action alternative that was rejected. *Id*. That violates NEPA. 40 C.F.R. § 1502.14; 42 U.S.C. § 4332; *Simmons*, 120 F.3d at 666-70; *Openlands*, 124 F. Supp. 3d at 807-10; *Sierra Club*, 962 F. Supp. at 1043-44. As the Seventh Circuit explained in *Simmons*:

> If NEPA mandates anything, it mandates this: a federal agency cannot ram through a project before first weighing the pros and cons of the alternatives . . . the Army Corps of Engineers executed an end-run around NEPA's core requirement. By focusing on the single-source idea, the Corps never looked at an entire category of reasonable alternatives and thereby ruined its environmental impact statement.

120 F.3d at 670. Here, it is a single *place*—the 10th Ward—akin to the flawed "single source" in *Simmons*, and this Court should likewise reverse and remand the Corps' EIS.

### E. The Corps' Four-Year Old EIS Is "Stale," Outdated and Must Be Supplemented

The Corps' 2020 EIS is almost four-years old, and there have since been an array of new CEQ NEPA regulations and Executive Orders on climate change, environmental justice and agencies' "hard look" analysis. Pl. Br. at 2-3, 20, 23-24, 33. The Corps incorrectly argues that these significant changes are irrelevant (Def. Br. at 33-34), but the Corps' own regulations require that "[a] supplement to the draft or Final EIS should be prepared whenever required" by CEQ's

16

NEPA regulations. 33 C.F.R. § 230.13. CEQ's regulations require that agencies "[s]hall prepare supplements to either draft or final environmental impact statements if a major Federal action remains to occur, and . . . There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(d).

The major federal action here—the Corps building its proposed new toxic dredged waste dump—has not occurred. The new CEQ regulations, the Executive Orders and the Corps' own CWA regulations are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." *Id.* These present "a seriously different picture of the environmental impact of the proposed project from what was previously envisioned." *Hughes River Watershed Conservancy*, 81 F.3d at 443. This Court should reverse and remand the Corps' EIS and ROD, and direct that a supplemental EIS be prepared. *See League of Wilderness Defs.*, 752 F.3d at 761 (concluding "that a supplemental EIS must be completed to show the environmental impact of the Snow Basin project on elk and their habitat"); *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 558 (9th Cir. 2000) (holding, under NEPA, that Forest Service review whether new standards governing old growth require an supplemental EIS); *Essex Cnty*, 536 F.2d at 961 (requiring supplemental EIS for proposed highway after a state law change).

## III. THE CORPS' NEW TOXIC DUMP IS NOT EXEMPT FROM PROJECT-SPECIFIC REVIEW OF WHETHER IT IS THE LEAST ENVIRONMENTALLY DAMAGING PRACTICABLE ALTERNATIVE AND IN THE PUBLIC INTEREST

The Clean Water Act provides that Corps projects comply with the 404(b)(1) Guidelines, which require that the Corps' selected project be the "least environmentally damaging practicable alternative" ("LEDPA") and not violate the "public interest." 33 U.S.C. § 1344(b)(1); Pl. Br. at 29-33. When the Corps built the CDF back in the 1980's, it did a project-specific "404(b)(1) Analysis," and now has done so for the DMDF loading dock. AR 003746-53; AR 038217.

The Corps makes three arguments that the proposed new toxic waste dump, overall, is exempt from any project-specific 404(b)(1) review. Def. Br. at 29. **First,** the Corps argues that its own CWA regulations and Executive Orders on environmental justice are "post-decisional" so they don't apply. Def. Br. at 29, 33-34. Because the Corps has *not* yet obtained the Illinois EPA's approval of its three state water quality permits required under the Clean Water Act, the decisions are still in play; they are not "post" anything. At the very least, supplementation is required.[8]

**Second,** the Corps relies on its flawed EIS to state that "the project will have minimal impacts while providing important local, regional, and national benefits." Def. Br. at 33. NEPA, however, requires agencies to conduct a full EIS when, as here, a project has "*significant* environmental impacts.*" 40 C.F.R. §§ 1501.3(a)(3), 1502.1. Otherwise, the agency makes a "finding of no significant environmental impact," leading to a more limited assessment. The Corps' argument the DMDF has "minimal" impacts contradicts its decision to do a full EIS here.

The Corps then somehow concludes that for a toxic dump on Lake Michigan's shoreline, exposed to storm winds whipping up heavy waves, in an environmental justice community where a park was promised, "[no] significant adverse impacts to the human and natural environment are anticipated as of result of constructing a DMDF at any of the alternative sites. Therefore, no minority or low-income populations would be exposed to disproportionately high adverse human health impacts or environmental effects." Def. Br. at 35. That is simply not sensible or credible.

---

[8] The Corps' litigation position here is contrary to its recently proposed *Corps of Engineers Agency Specific Procedures to Implement the Principles, Requirements, and Guidelines for Federal Investments in Water Resources,* 89 Fed. Reg. 12066 (Feb. 15, 2024). The ASPs make Environmental Justice one of five Guiding Principles for Corps projects, requiring that these communities be "fully protected" and "[a]ny disproportionate adverse public safety, human health, or environmental burdens of project alternatives on communities with environmental justice concerns shall be avoided, minimized, or mitigated to the greatest extent reasonable." 89 Fed. Reg. 12066, 12100. The ASP's also require that alternatives analyses include: (1) a no action alternative; (2) a nonstructural alternative; (3) a nature-based solution alternative; (4) an environmentally preferred alternative; (5) an alternative that maximize net public benefits; and (6) an alternative that's locally preferred. 33 C.F.R. § 234.8 (proposed); *Id.* at 12104.

18

Under section 401 of the Clean Water Act, federal permits require state water quality certifications, 33 U.S.C. § 1341, and states can add conditions. Illinois has added a condition to Nationwide Permit 16 ("NWP 16") that projects *in Lake Michigan* get individual water quality review. *See* Exhibit 3 at 11. That reflects Illinois EPA's judgment that Lake Michigan "contained disposal area" projects do *not* have "minimal adverse environmental impacts," and are not exempted from individual review. The Illinois EPA's April 25, 2023 letter (Exhibit 1) rejects the Corps' attempted use of a general permit and requires an individual project-specific permit.

**Third,** the Corps argues that it can avoid the LEDPA and public interest requirements in the 404(b)(1) Guidelines because this project fits within the Corps' general NWP 16 and therefore immunizes its proposed new toxic dump from any project-specific analysis. Section 404(e)(1) states that NWPs can only be used if the activities "will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1). District engineers are expected to do individual permits, and not rely on NWPs, when projects have more than minimal adverse environmental effects.[9]

By doing a full EIS, the Corps' recognized "significant" environmental effects. The Illinois EPA agreed by adding conditions to NWP 16. Even under NWP 16, district engineers must "determine whether [an] activity authorized by [NWP 16] will result in more than minimal individual or cumulative adverse environmental effects or may be contrary to the public interest." If "yes," then the engineer can "exercise discretionary authority to require an individual permit for the proposed activity." NWP 16 at 17. The "site-specific" factors for evaluation include "the environmental setting in the vicinity of the NWP activity" and "the importance of the aquatic resource functions to the region (e.g., watershed or ecoregion)." NWP 16 at 18, para. 2. There is

---

[9] U.S. Army Corps, *Regional and Programmatic General Permits.* http://bit.ly/3VMDNZS

no record evidence that the district engineer analyzed these factors to determine whether this project could be exempted from "least environmentally damaging practicable alternative" and "public interest" review. This Court should reverse and remand on these Clean Water Act grounds, and direct the Corps to do a project-specific review, and, at least, supplement its outdated decision.

## IV.     PLAINTIFFS CLEARLY HAVE STANDING

Defendants superficially challenge Plaintiffs' well-established standing by invoking *Protect Our Parks* without any real reasoning. Def. Br. at 16. The plaintiffs in that case alleged generalized taxpayer standing and had no differentiated injury. *Protect Our Parks, Inc. v. Chicago Park Dist.*, 971 F.3d 722, 731-32 (7th Cir. 2020). By contrast, the two Plaintiff organizations here have longstanding engagement in the Southeast Side community, have long been involved in protecting the lakefront and its parks, and participated in filling written and oral comments during the federal and state administrative permit and approval processes. Pl. Br. at 33-35; PApp. at 87-88, 103-04. The 12 declarations filed with this Court demonstrate Plaintiffs' members live, work and play in the Southeast Side community, use and enjoy Calumet Park, and describe specific, identifiable harms regarding the Corps' proposed toxic dredged wastes dump. PApp. at 87, 90-92, 94-95, 98, 100-101, 108-09, 111, 116-117, 120. *Friends of the Earth v. Laidlaw Env't Serv.*, 528 U.S. 167, 183 (2000); *Am. Bottom Conservancy v. Army Corps of Eng'rs*, 650 F.3d 652, 658 (7th Cir. 2011); *Hoosier Env't Council v. Natural Prairie Indiana*, 564 F. Supp. 3d 683, 699 (N.D. Ind. 2021) (six standing affidavits); *Sierra Club*, 962 F. Supp. at 1042 (affidavits describing harms).

**CONCLUSION**

The Court should grant Plaintiffs' motion for summary judgment, vacate and remand Defendant's EIS and ROD, and enjoin construction of the Corps' proposed new toxic dredged waste dump at the lakefront site in Chicago's Southeast Side. At the very least, the Court should require supplementation of the outdated and flawed analysis as explained above.

Respectfully submitted,

*Howard Learner*

HOWARD A. LEARNER
DANIEL ABRAMS
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1600
Chicago, IL 60601
(312) 673-6500
HLearner@elpc.org
DAbrams@elpc.org

*Attorneys on behalf of Plaintiffs*
*Alliance of the Southeast and Friends of the Parks*